637 So.2d 1097 (1994)
Daryl GEORGE
v.
DEPARTMENT OF FIRE.
No. 93-CA-2421.
Court of Appeal of Louisiana, Fourth Circuit.
May 17, 1994.
*1099 Lee Archer McCarthy, New Orleans, and Ernest A. Burford, Dallas, TX, for plaintiff-appellant.
Elmer G. Gibbons, Deputy City Atty., Kathy Lee Torregano, City Atty., Jay Alan Ginsberg, Ann M. Sico, Asst. City Attys., New Orleans, for City of New Orleans.
Before KLEES, WARD and PLOTKIN, JJ.
PLOTKIN, Judge.
Plaintiff/appellant Daryl George (George), a fireman with the City of New Orleans Department of Fire, appeals a City Civil Service Commission (Commission) decision upholding his termination from employment with the department. We affirm.

FACTS
Around 10 p.m. on April 29, 1992, George obtained permission from his supervisor to take a short-term annual leave from his duty as a firefighter to give his sister a ride home from her place of employment. He actually used the leave to give a friend's sister a ride from her place of employment to pick up her child at a babysitter's house before taking her home. While driving down Orleans Avenue with his female passenger, two New Orleans police officers observed George driving erratically and swerving in and out of *1100 traffic after making a U-turn. The police officers stopped George. According to both officers, George's behavior during the stop was belligerent and abusive. Officer Prats testified that George was combative and cursed the officers when he was asked to exit the vehicle. Officer Scanlan also testified that George was verbally abusive. Because George was a firefighter, the police officers called the command desk to have both their ranking officers come to the scene.
Eventually, George's superior, Chief O'Neil, arrived on the scene. According to Chief O'Neil, the police told him that they had stopped George for reckless driving because he was swerving in and out of traffic. The police explained that George was screaming and acting belligerently. The officers indicated to Chief O'Neil that they suspected by his actions that George was on some kind of drugs. Chief O'Neil said that the officers opined that "he may be on something." Since Mr. George was temporarily off duty at the time he was stopped, Chief O'Neil directed George to return to the firehouse after dropping off his passenger and return to duty.
In the meantime, Chief O'Neil conferred with his superior, Chief Trapagnier; the two of them decided to immediately perform a drug test on George based on the information provided by the police officers. Upon George's return to the station, Chief O'Neil drove him directly to Marine Medical Unit to be drug tested. Subsequently, George's urine sample tested positive for cocaine. After the Fire Department received notice that George's sample tested positive for cocaine, George was placed on suspension.
On May 26, 1992, a letter was sent to George by regular and certified mail, notifying George that as a result of his positive test results he was being placed on suspension pending investigation by the Department Board Of Internal Affairs. Additionally, George was ordered by the department to appear at a hearing of the Board of Internal Affairs on June 3, 1992. However, this letter mistakenly indicated that George had taken a random drug test. George attended the June 3 hearing and was advised that he could offer evidence and testimony in his own behalf relative to the charges against him. At the meeting, George was informed of the reason for his suspension. More specifically, he was informed that as a result of the incident that took place with the police on April 29, 1992, the department had found reasonable suspicion to test George for alcohol or drugs and that the results of the test indicated that he was under the influence of cocaine at the time. George was offered then offered the opportunity to respond to the charges; George took advantage of this opportunity.
A second letter was sent to George on July 21, 1992 by regular and certified mail informing him that a second hearing would be held on July 31, 1992, before the Department Board Of Internal Affairs. George was ordered to show cause why he should not be terminated from his employment because of his violation of the city's drug abuse policy. George was also notified in the July 21st letter of the misstatement contained in the May 26th letter. George was informed in writing that he was tested for reasonable suspicion, not random testing. George appeared for his hearing on July 31, 1992. At the hearing, George was once again apprised of the charges against him and given the opportunity to respond to the charges. On August 6, 1992, George received notification of his termination for being under the influence of cocaine, based upon the report of the New Orleans Police Department officers who stopped his vehicle while he was on short-term leave from duty. All the information contained in the August 6, 1992 letter had been previously provided to George during the two hearings he attended.
George appealed his termination to the City Civil Service Commission. A hearing was held before Hearing Officer Harry Tervalon. Subsequently, the Commission found the termination appropriate and dismissed the appeal with extensive reasons for judgment.
Three issues are presented for appellate review: (1) whether the Commission erred in failing to invalidate the drug test, (2) whether the notice and hearing afforded George were sufficient to meet the requirements of procedural due process, and (3) whether the Commission *1101 based its decision upon sufficient evidence.

GENERAL PRECEPTS
The Louisiana Constitution of 1974 established the City Civil Service, which includes paid firemen and municipal policemen. La. Const. art. X, § 1(B); Walters v. Department of Police of the City of New Orleans, 454 So.2d 106, 112 (La.1984). An employer cannot subject a permanent classified city civil service employee to disciplinary action except for cause expressed in writing. Upon appeal from such disciplinary action to the City Civil Service Commission, the appointing authority has the burden of proof as to the facts. La. Const. art. X, § 8. The Commission's decision is subject to review on any question of law or fact upon appeal to the court of appeal. La. Const. art. X, § 12(B).
The Commission has a duty to decide independently from the facts presented whether the appointing authority had good or lawful cause for taking the disciplinary action and, if so, whether the punishment is commensurate with the dereliction. Walters, 454 So.2d at 113; Cittadino v. Department of Police, 558 So.2d 1311, 1315 (La.App. 4th Cir.1990). Legal cause exists if the employee's conduct impairs the efficiency of the public service in which the employee is engaged. Cittadino, 558 So.2d at 1315. The appointing authority must prove by a preponderance of the evidence that the act occurred and that the act bears a real and substantial relationship to the efficient operation of the public service. Id.
When reviewing the Commission's findings of fact, the appellate court must apply the clearly wrong or manifestly erroneous standard of review. Walters, 454 So.2d at 113. When there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review. Barquet v. Department of Welfare, 620 So.2d 501, 505 (La.App. 4th Cir.1993). The Commission's findings of fact cannot be manifestly erroneous where there are two permissible views of the evidence. Id. When reviewing a Commission conclusion as to the existence or absence of cause for dismissal, however, the appellate court should not reverse the Commission's decision unless it is arbitrary, capricious, or an abuse of discretion. Walters, 454 So.2d at 113.

DRUG TEST
As the drug test involved here was obviously not random, we must determine whether reasonable suspicion existed to allow the appointing authority to test George for substance abuse. Initially, we note that the Fourth Amendment of the United States Constitution prohibition against unreasonable searches and seizures by government officials is applicable to the states via the Fourteenth Amendment. State v. Church, 538 So.2d 993 (La.1989). The Louisiana Constitution protects against unreasonable invasions of privacy as well as unreasonable searches and seizures. Id. at 997. La. Const. art. I, § 5.
Furthermore, the collection and subsequent analysis of biological samples for the purpose of drug testing with government encouragement, endorsement, and participation are Fourth Amendment searches. Skinner v. Railway Labor Executives' Association, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Therefore, such searches must meet the reasonableness requirements of the Fourth Amendment. National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).
It is reasonable for a governmental employer to order an employee to submit to a drug test on the basis of individualized suspicion in certain circumstances. Banks v. Department of Public Safety and Corrections, 598 So.2d 515, 518 (La.App. 1st Cir. 1992). The factors to consider in determining whether an employer has reasonable suspicion that a particular employee is a user of illegal drugs was set forth in Banks, citing Fraternal Order of Police, Lodge No. 5 v. Tucker, 868 F.2d 74 (3d Cir.1989), as follows: (1) the nature of the tip or information; (2) the reliability of the informant; (3) the degree of corroboration; and (4) other facts contributing to suspicion or lack thereof. Banks, 598 So.2d at 519.
In both Banks and Tucker, the employer's suspicion originated from an unknown informant. The appointing authority *1102 in this case points out that because of the unreliable nature of unknown information sources in such cases, the degree of corroboration is an important factor. However, here, the appointing authority argues, the source is known and reliable. Unlike anonymous informants with questionable reliability, the appointing authority contends that information from law enforcement officers is reliable by its nature. We agree. The Hearing Officer found that:
The appellant was stopped by police officers for traffic violations and, because of his behavior was later tested and found to be positive for drugs.
A serious question to the Hearing Officer was the purpose of the original stop and the attitude of the officers involved. This Hearing Officer found the officers to be very professional and went far beyond the call of duty in maintaining control of the situation. The officers cut a lot of slack, as it is called, because the stop involved a fireman. A gun was confiscated and later returned to the Appellant. This would not be the normal procedure except in the case where the officers are lenient.
The Commission made the following findings:
Appellant was granted an emergency leave by his supervisor to do something for his sister, but instead used the leave to drive a lady friend home from work. Somewhere en route the Appellant was stopped by the police for traffic violations, more specifically, reckless driving. He also displayed a belligerent attitude toward the police who suspected that Appellant was "on something." One of Appellant's supervisors was called to the scene and later ordered the Appellant to be drug tested. The drug test that followed was positive (428 nanograms) which resulted in the termination of Appellant pursuant to Chief Administrative Office (CAO) Policy Memo no. 89 and N.O.F.D. policy 2/06-p-01-91.
Based on the circumstances presented in this case, we are unable to say that the Hearing Officer or the Commission was manifestly erroneous in its findings. In this case, the information came from police officers. As a result of the New Orleans police officers' statements to Chief O'Neil concerning George, George's superiors suspected him of substance abuse. The Fire Department was entitled to rely on the statements of the police officers in forming reasonable suspicion. Williams v. State, 157 Ga.App. 476, 277 S.E.2d 923, 926 (1981), cert. denied 454 U.S. 823, 102 S.Ct. 108, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981) (when informant is a police officer, reliability is assumed as a matter of law). In criminal cases, reasonable suspicion to make a stop may be based on information from an informant, if the information carries sufficient indicia of reliability to justify a stop. State v. Bolden, 380 So.2d 40 (La. 1980), cert. denied 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980). Courts have also said that information from citizen informers is presumptively reliable. State v. Lehnen, 403 So.2d 683, 685 n. 3 (La.1981); State v. Richmond, 464 So.2d 430, 435 (La.App. 1st Cir.1985), writ. denied 467 So.2d 535 (La. 1985). Even in the absence of corroboration, information provided by police officers is reliable enough to establish reasonable suspicion.[1] Therefore, the drug test is valid under the federal and state constitutions.
George argues that the drug test is invalid under Louisiana statutory law and the written Fire Department policy because those laws provide that public employee drug testing must occur pursuant to a written policy. LSA-R.S. 49:1015(D). The Fire Department's written policy is contained in *1103 N.O.F.D. Standard Operating Procedure Number 2/06/-S-02-91 (SOP) relating to substance abuse testing. Mr. George asserts that the drug test did not comply with the reasonable testing allowed under SOP 9.2.1 Level I which provides that "[a]ny member whose actions or behavior seems erratic or abnormal or whose body movements and functions are impaired or unstable, may be considered for Category III screening." However, we find that the test did comport with the requirements of screening under SOP 9.2.2 Level II, which allows drug testing when any apparent facts or evidence indicate possible substance abuse on the job. Finally, the argument that the drug test must be declared invalid because the Fire Department's policy is constitutionally vague is without merit. Accordingly, the Commission properly refused to invalidate the drug test.

NOTICE AND HEARING
George contends that he was not afforded notice and a proper hearing in violation of his rights to due process. According to George, these due process rights are found in the Administrative Procedure Act (APA), LSA-R.S. 49:950 et seq. In Paulin v. Department of Sanitation, 383 So.2d 1064 (La.App. 4th Cir.1980), this court applied the APA to a ruling of the Civil Service Commission of the City of New Orleans. The Paulin court followed this court's earlier decision in Quinn v. Department of Health, 347 So.2d 954 (La. App. 4th Cir.1977), which held that the "Administrative Procedure Act does not except the [City Civil Service] Commission from its applicability." However, George's arguments ignore the fact that 1979 amendments to the APA legislatively overruled Paulin[2] because they exempted the City Civil Service Commission from the requirements of the APA, as explained below.
The APA applies only to state agencies.[3] According to the APA, as amended in 1979, "`[a]gency' means each state board, commission, department, agency, officer, or other entity ... except the legislature or any branch, committee, or officer thereof, any political subdivision, as defined in Article VI, Section 44 of the Louisiana Constitution, and any board, commission, department, agency, officer, or other entity thereof, and the courts." LSA-R.S. 49:951(2). "Political subdivision" is defined as "a parish, municipality, and any other unit of local government, including a school board and a special district, authorized by law to perform governmental functions." La. Const. art. VI, § 44(2). The clear language of the APA excludes the City Civil Service Commission from its coverage. LSA-R.S. 49:951(2); Paulin, 383 So.2d at 1065 (Boutall, J. concurring in result only).
Despite this unambiguous language, commentators suggest that one might apply the "creation test" of Buras v. Board of Trustees of the Police Pension Fund of the City of New Orleans, 367 So.2d 849 (La. 1979), to determine the meaning of the term an "entity thereof." Force and Griffith, The Louisiana Administrative Procedure Act, 42 La.L.Rev. 1227 (1982). The Supreme Court in Buras, which was decided before the 1979 amendment to APA, held that the Board was a state "agency" within the contemplation of the APA because the legislature created the Board and gave the Board its authority. Thus, the Court applied the APA to the Board's proceedings.
Following this reasoning, one might conclude that the City Civil Service Commission is a state agency because it was created by the state constitution. However, the Buras court noted that "[i]f the legislature meant to exempt state boards having limited geographic jurisdiction from the coverage under the Administrative Procedure Act, we consider that express language to that effect would have been used." Buras, 367 So.2d at 852, fn. 5. The 1979 amendment to the APA provided the express language the Buras *1104 court was looking for to exclude political subdivisions and their entities.
George argues that the Commission erred by not finding that his rights were violated by the alleged failure of the appointing authority to notify him of the reason for the drug test at the time he was ordered to take it, by the alleged failure of the appointing authority to notify him of the results of the test or the reason for his suspension when initially informed of his suspension, and by the appointing authority's initially notifying him that the test was a random drug test rather than a test for reasonable suspicion.
In Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme Court defined the minimum procedures due prior to the discharge of a tenured public employee. According to the court, a pre-termination hearing should be held. This hearing need not be elaborate, and it may be something less than a full evidentiary hearing. In essence, this pre-termination hearing should be an initial inquiry to determine whether reasonable grounds existed to believe that the charges against the employee are true in order to support the purposed action. The purpose of the pre-termination hearing is not to definitely resolve the propriety of the discharge, but to guard against mistaken decisions. In accordance with Loudermill, the New Orleans Civil Service Commission Rules of Civil Service, Rule IX § 1.2 also provides that: "In every case of termination of employment of a regular employee, the Appointing Authority shall conduct a pre-termination hearing as required by law and shall notify the employee of the disciplinary action being recommended prior to taking the action."
Here, George was afforded a pre-termination hearing, as required above. George admits that during the pre-termination hearing he was apprised of the charges against him and received the opportunity to respond to the charges. The appointing authority notified George both orally and in writing that it was considering termination before the pre-termination hearing. George's captain notified him of the hearing and his suspension on May 23, 1992 by telephone. On May 26, 1992, a letter was sent to George by regular and certified mail notifying him that as a result of his positive test results for cocaine metabolite he was being placed on suspension pending an investigation by the Department Board of Internal Affairs. The notice further informed George that he was required to attend the hearing before the Board Of Internal Affairs on June 3, 1992 and to be prepared to offer evidence and testimony on his own behalf.
The notice requirements applicable to the appointing authority are found in La. Const. art. X, § 8(a) which provides, in pertinent part, as follows: "Disciplinary Actions. No person who has gained permanent status in the classified state or city service shall be subjected to the disciplinary action except for cause expressed in writing." This court in Montgomery v. Department of Streets, 593 So.2d 1352, 1354 (La.App. 4th Cir.1992), discussed the purpose of the notice requirement contained in the Louisiana Constitution, stating as follows:
The purpose of the notice requirement established by the above article is to inform the employee of the charge against him in detail, and to limit and restrict the commission hearing to those charges. Ellins v. Department of Health, 505 So.2d 74, 76 (La.App. 4th Cir.1987). Depending on the circumstances of the case, the employee must be informed of the time, place and nature of the alleged misconduct in sufficient detail to enable the employee to adequately prepare his defense. Department of Safety v. Rigby, 401 So.2d 1017, 1021 (La.App. 1st Cir.), writ denied 406 So.2d 626 (La.1981). Municipal employees may not be disciplined for the reasons other than those specified in the written notice. Polite v. Department of Welfare, 543 So.2d 529, 530 (La.App. 4th Cir.1989).
This written notice requirement pertains to the termination letter required after the employee has received a Loudermill pre-termination hearing. Brown v. Housing Authority of New Orleans, 590 So.2d 1258, 1260 (La.App. 1st Cir.1991).
After the pre-termination hearing on June 3, 1992, the department sent a letter dated July 21, 1992 to George by certified and *1105 regular mail. This second letter informed George that the drug test was actually a reasonable suspicion test rather than a random test as he had been mistakenly informed in the May 26, 1992 letter. Moreover, the letter stated that a second hearing (this was the termination hearing) would take place on July 31, 1992 before the Department Board of Internal Affairs and that he should show cause why he should not be terminated from his employment because of his violation of the City's drug abuse policy. While Mr. George claims that he did not know the basis of the drug test prior to the July 31, 1992 termination hearing because he did not remember receiving the July 21, 1992 letter, his presence at the July 31st hearing indicates that he did receive notice.[4] In fact, George had been apprised of the reasons for the drug test during the pre-termination hearing on June 3, 1992. Therefore, we conclude that George received sufficient notice.
Furthermore, George contends that the appointing authority's failure to offer live testimony relating to the chain of custody and the testing of the sample prohibited him from cross-examining the positive test results and violated his right to due process. To support his position, George relies on the APA, which we have refused to apply here,[5] and Bourque v. Louisiana State Racing Commission, 611 So.2d 742 (La.App. 4th Cir. 1992), which also relies on the APA. In Bourque, this court invalidated a suspension of a jockey who allegedly tested positive for cocaine on the grounds that the Racing Commission presented only hearsay evidence of the test results, denying Bourque the opportunity to cross-examine the only evidence introduced against himspecifically, the positive test results.
The Bourque court discussed a prior case before this court, Hall v. Louisiana State Racing Commission, 505 So.2d 744 (La.App. 4th Cir.1987), wherein the suspension of a racehorse trainer's license based upon nothing more than the Racing Commission's in globo introduction of evidence, without any foundation testimony or opportunity for cross-examination, was held invalid. The Bourque court quoted Hall as follows:
By this holding we do not intend to imply that hearsay evidence is inadmissible, or that documentary evidence is incompetent in an administrative hearing. Certainly they can be used, along with other competent evidence to reach a true factual finding. However, where a finding is based solely on this type of evidence, both substantive and procedural due process is violated. At the very least Hall should have had the opportunity to cross-examine the only evidence used against him.
Mr. George argues that the facts in the instant case are virtually identical to those in Bourque.
However, we believe the facts are closer to those in Brasseaux v. Louisiana State Racing Commission, 577 So.2d 324 (La.App. 4th Cir.1991), writ denied 580 So.2d 670 (La. 1991). In Brasseaux, the appellant cited Hall and argued that his right to due process was violated by the suspension of his trainer's license based on nothing more than the Racing Commission's in globo introduction of evidence without any foundational testimony. Id. at 326. As the Brasseaux court explained, the Hall court found no error in the in globo introduction of evidence or with the introduction of hearsay documentary evidence in an administrative hearing. Id. The Hall court's concern was that the totality of the evidence against Hall was documentary and hearsay. Id.
Accordingly, the Brasseaux court concluded that Brasseaux had been afforded and took advantage of the opportunity of cross-examining live witnesses. In Brasseaux, the Racing Commission offered live testimony from the state steward, the commission chemists, the commission veterinarian (who supervised the operation of the test barn), *1106 and the commission specimen collector of the specimen involved. Id.
In the present case, like Brasseaux, there was testimony from several witnesses in the chain of custody. These witnesses included the director of toxicology, the supervisor of the confirmatory laboratory, the screen supervisor, assessioning supervisor, all from the testing laboratory, the specimen collector, and the courier. Although the appointing authority did not call all of these witnesses, the hearing officer allowed the witnesses to be called out of order and each of the above witnesses testified before the appointing authority completed its case in chief.[6]
Maria Miller, the specimen collector at Marine Medical, specifically recalled taking a sample from George. She further testified that she followed her routine practice required to protect the integrity of George's sample. She remained with George while he gave his sample, insured the proper sealing of the sample, and secured the sample in a locked refrigerator before he departed.
Susan Domangue, the assessioning supervisor, testified to the laboratory's receiving the sample and the chain of custody documents, filled out by Maria Miller at Marine Medical, from the courier, Kenneth Johnson. Ms. Domangue identified her signature on the chain of custody form. She also recognized Kenneth Johnson's printed signature on one of the chain of custody documents. In his testimony, Kenneth Johnson acknowledged his printed signature as well. Additionally, even though Stacey Nash, the screen supervisor, did not have any specific recollection of George's sample or aliquot, she was in the chain of custody. Furthermore, Donald Wolford, the confirmatory laboratory supervisor who also does technical work, identified his signature on the chain of custody document and certified that George's sample was the sample that tested positive for cocaine.
Finally, Pat Pizzo, the director of toxicology, testified that she was responsible for quality control review and her signature is found in the laboratory documents, specifically the Aliquot Chain of Custody Screening and the Aliquot Chain of Custody Second Test. She is qualified to testify that the tests were conducted properly because that is her specific responsibility. Ms. Pizzo further testified to the testing performed and the analytical methods utilized. Hence, we find that George had and took advantage of the opportunity to cross-examine live witnesses in the instant case. We hold that the chain of custody was unbroken and that the record clearly supports the conclusion that the appellant's specimen tested positive for cocaine metabolite. The appointing authority adequately complied with the minimal standards for procedural due process in administrative hearings before the City Civil Service Commission.

SUFFICIENCY OF THE EVIDENCE
The Commission's findings must be based on competent evidence; incompetent evidence will not be considered by the appellate court on review. Cittadino, 558 So.2d at 1315. The party seeking to introduce test results must first lay a proper foundation by connecting the specimen with its source, showing that it was properly labeled and preserved, properly transported for analysis, properly taken by an authorized person, and properly tested. Segura v. Louisiana State Racing Commission, 577 So.2d 1031, 1033 (La.App. 4th Cir.1991); Brasseaux, 577 So.2d at 327; Swanson v. Estate of Augusta, 403 So.2d 118, 124 (La.App. 4th Cir.1981), writ denied 407 So.2d 732 (La. 1981).
In Segura, a trainer appealed the Racing Commission's fine and suspension of his license after a test of his horse's urine showed the presence of morphine. The Segura court considered the appellant's contention that the Racing Commission had failed to prove the integrity of the sample by laying a proper foundation. Specifically, the appellant argued that there was no evidence that the specimen taken from his horse was the specimen delivered to the laboratory because of the unknown identities of the bus station *1107 personnel who handled and transported the specimen to the chemist. After reciting the above requirements for the admission of test results, the Segura court explained that:
The chain of custody rule is intended "to preserve the integrity of the evidence, i.e., to prevent [it] from being tampered with or ... lost." Bufkin [v. Mid-American Indemnity Co.], 528 So.2d [589] at 592 [(La.App. 2nd Cir.1988)]. Accord, LaBella [v. Louisiana State Racing Commission], 569 So.2d [58] at 61 [(La.App. 4th Cir.1990)]. Schwab [v. Galuszka], 463 So.2d [737] 742 [(La.App. 4th Cir.1985)]. This Court has determined that, in a civil case, twenty-four hour vigilance of the evidence is not required. LaBella, 569 So.2d at 61. What is essential is preserving the integrity of the evidence and protecting it from tampering and loss. Id. These factors must be established by a preponderance of the evidence. LaBorde v. Louisiana State Racing Commission, 560 So.2d 594, 597 (La.App. 4th Cir.1990).
Id., 577 So.2d at 1033. According to the court, the crucial events in the chain of custody collection, sealing, delivery to and receipt by chemist, as well as testing performed and analytical methods usedwere attested to by witnesses. Id. at 1033-1034. Considering that testimony and the appellant's failure to produce any positive evidence showing that the horse's specimen was tampered with, lost, or not the one tested, the Segura court found that the Racing Commission established by a preponderance of the evidence that there was no break in the chain of custody. Id. at 1034.
The Brasseaux court also considered an identical argument to the one presented here, alleging a break in the chain of custody due to the lack of testimony and evidence of who transported the test sample to the laboratory and who handled it there. In finding that the chain of custody for the urine sample was properly established and admitted, the Brasseaux court explained that the chain of custody rule does not require that every person associated with the procedure be identifiedonly that safeguards be instituted to insure the integrity of the evidence. Brasseaux, 577 So.2d at 328. The court also noted that:
The racing commission has a host of security procedures. Namely, once a sample is taken it is sealed and labeled. Those responsible for taking and testing the samples are required to initial it. When transported the sample is stored in a box sealed with tamper-evident tape and it is signed by the persons who ship the box. Dr. Barker testified that if there is any indication that the box is opened or that the samples were tampered with the commission is notified.
Id.
In the instant case, witnesses testified concerning compliance with similar security procedures. Ms. Pizzo, like Dr. Barker, testified that if there are any indications that the samples have been tampered with the sample is rejected and the form is labeled unacceptable.
As discussed above, the appointing authority's burden of proof in a Civil Service Commission hearing is carried by a preponderance of the evidence. Although the facts must be clearly established, they need not be established beyond a reasonable doubt as in a criminal case. Barquet, 620 So.2d at 505; Cittadino, 558 So.2d at 1315. Based on our previous discussion concerning the testimony of the witnesses in the chain of custody in the present case, we conclude, as did the Segura court, that the witnesses testified to the crucial events in the chain of custodycollection, sealing, delivery to, and receipt by the chemist, testing performed, and analytical methods used. Additionally, George failed to provide any evidence showing that his specimen was tampered with, lost, or not the one tested.[7] In short, we are persuaded that the appointing authority established the integrity *1108 of the chain of custody by a preponderance of the evidence. Therefore, the evidence relating to the chain of custody was both admissible and competent.
Moreover, we reject George's alternative argument that the evidence flowing from the police officer's illegal stop should be declared inadmissible as "fruit of the poisonous tree." Because we find that the contested evidence is admissible even if the police officer's stop was illegal, we do not consider whether the police stop of George was based on the required reasonable suspicion.
In Pullin v. Louisiana State Racing Commission, 484 So.2d 105 (La.1986), the Louisiana Supreme Court considered the issue of whether illegally-obtained evidence would still be admissible in a civil administrative proceeding. The Pullin case involved the admissibility of evidence that was illegally obtained by state police officers in civil proceedings before the Racing Commission. Applying the "balancing test" of United States v. Janis, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), the Pullin court held that the exclusionary rule did not apply in civil proceedings before the Racing Commission because the likely social costs of excluding the unlawfully-seized evidence outweighed the likely social benefits. The deterrent value of extending the rule to the civil proceeding before the Racing Commission was the benefit to be considered. Id. at 107. The Pullin court observed that the primary duty of state police officers was to enforce criminal laws. The court further observed that the application of the exclusionary rule is a significant deterrent because it frustrates that duty. Id. On the other hand, the court explained that the social costs of applying the rule would require the Racing Commission to exclude relevant and reliable evidence and jeopardize the state's vital interest in maintaining the integrity of the horse racing industry. Id. Accordingly, we refuse to apply the exclusionary rule because the essential factors militating against the application of the rule in Pullin are equally relevant here.
For the foregoing reasons, the judgment of the Commission is affirmed.[8]
AFFIRMED.
NOTES
[1] United States v. Phillips, 664 F.2d 971 (5th Cir.1981), cert. denied 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1981) (uncorroborated tip from previously reliable informant may justify a stop). Chief O'Neil's testimony regarding the police officers' statements to him is not hearsay as the testimony was not offered in evidence to prove the truth of the matters asserted. Here, we are not passing on whether or not the police officers had reasonable suspicion to stop George. We have concluded that George's supervisors formed reasonable suspicion based on the information relayed by the police officers. Richmond, 464 So.2d at 433, citing State v. Mosley, 412 So.2d 527 (La.1982) ("If the informant lied, but the officer reasonably believed him, it cannot be said that the officer acted without probable cause"). The Fourth Amendment requires only reasonableness and not factual accuracy. Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).
[2] The decision of the Civil Service Commission in Paulin was rendered on June 4, 1979; the amendments to LSA-R.S. 49:951(2) became effective some six weeks later on July 18, 1979.
[3] The cases George cites in support of his arguments under the APA arise from appeals from entities that are clearly state agencies, such as the State Civil Service Commission and Louisiana State Racing Commission. Specifically, Mr. George cites Howard v. Housing Authority of New Orleans, 457 So.2d 834 (La.App. 1st Cir.1984) which arose on appeal from a decision of the State Civil Service Commission.
[4] Mr. George did not provide an alternate explanation for how he knew to attend the meeting other than through the letter.
[5] LSA-R.S. 49:955(C) provides as follows: "Opportunity shall be afforded all parties to respond and present evidence on all issues of fact involved and argument on all issues of law and policy involved and to conduct such cross-examination as may be required for a full disclosure of the facts."
[6] The order of witnesses was apparently agreed to by the parties to allow the witnesses to return to work earlier.
[7] The Commission's resolution of the conflicting testimony between Maria Miller and George regarding the events during the collection of his sample was not clearly wrong. Barquet, 620 So.2d at 505. Furthermore, George asserts that the hearing officer committed reversible error in failing to admit his dentist's letter stating that he was taking prescription medication containing codeine which should have showed up in the tests. On the contrary, this letter was properly refused as incompetent evidence due to George's failure to produce foundational testimony.
[8] On appeal appellant attached exhibits 1-8 to his brief. Appellee moved to strike exhibits 3-8. We conclude that exhibits 3, 4 and 8 are admissible and have incorporated references to them in our opinion. Exhibits 5, 6 and 7 are inadmissible and are stricken from the record.