713 So.2d 838 (1998)
Kevin MURRAY
v.
DEPARTMENT OF POLICE.
No. 97-CA-2650.
Court of Appeal of Louisiana, Fourth Circuit.
May 27, 1998.
*839 Avis Marie Russell, City Attorney, Franz L. Zibilich, Chief Deputy City Attorney, Joseph V. Dirosa, Jr., Deputy City Attorney, New Orleans, for Appellant.
Alan B. Tusa, Tusa & Richards, L.L.C., Metairie, for Appellee.
Before BARRY, WALTZER and LANDRIEU, JJ.
LANDRIEU, Judge.
This matter arises out of the dismissal and reinstatement of a police officer, who allegedly failed a drug screen test. The issue presented is whether the City sustained its burden of proving the chain of custody for admission of the test results, even though two of the technicians who handled the sample were unable to testify. The Civil Service Commission found the City had not proved its case against Murray in accordance with evidentiary requirements. For the reasons *840 discussed below, we reverse the Commission's finding.
On April 28, 1994, Police Officer Kevin Murray, an employee of the New Orleans Police Department since August of 1982 and who was to be promoted to Police Officer IV, submitted to a Promotional Drug Screen pursuant to Chief Administrative Officer Policy Memorandum 89 and Civil Service Rule V, Section 9. These regulations require all non-reserve employees to participate in substance abuse testing when promoted. The results of the drug screen were positive for the presence of marijuana; consequently, Murray was dismissed from the Police Department.
Murray appealed to the Civil Service Commission. Following a hearing, the Commission rendered a decision on May 15, 1997, reinstating Murray to his position with the Department. The City's motion for rehearing was filed on June 26, 1997, and denied on October 29, 1997. The City timely appealed to this Court.
The testimony at the hearing focused on the chain of custody with regard to the urine sample and the procedure employed in the collection and testing of the sample. A standard operating procedure is used throughout the screening process and details of the chain of custody for each sample to be tested are recorded on a chain of custody document. This document was entered into evidence as part of a laboratory packet, which included the courier's log, the accessioning batch chain of custody for the sample, the screening batch chain of custody, the calibration report, the test results, the GC/MS confirmation aliquot control sheet, and the report prepared by the laboratory and sent to the City.
The urine sample was collected from Murray at Marine Medical Unit (MMU) by Jeannette Nolasco on April 28, 1994, at 11:45 a.m. Nolasco testified that Murray provided personal information such as driver's license number, social security number, and reason for taking the test. After Nolasco filled in the form with identifying personal information, Murray took a sample bottle behind a screen in the bathroom, filled it with his urine, labeled and sealed it himself with a sticker on which a unique bar code was printed, and placed the sealed bottle in a clear bag which was then sealed by the collector. The chain of custody form and the sample thus had identical bar codes identifying the specimen as having been provided by Murray: No. A2545643A. This bar code served to identify the specimen to be delivered to the laboratory. Murray, as the tested individual, signed the chain of custody form acknowledging that the sample collected was his own specimen. Nolasco, the collector, also signed the form certifying that the collection protocol had been followed and that the specimen was the one presented to her by Murray. Nolasco testified that the individual's name and social security number are also placed on the sample for additional identification.[1]
The courier, Patricio Alvarez, picked up the samples from MMU and took them to the testing laboratory, Laboratory Specialists, Inc. (LSI). Alvarez testified that he checks the samples for leakage before leaving MMU, reporting any leakage to the nurse. Thereafter, he took the samples directly to LSI, a ten- to fifteen-minute trip, because MMU was his last stop of the day. Alvarez testified regarding a log which he completes as samples are picked up from the collection site and delivered to the testing facility. According *841 to his testimony, the samples from MMU were picked up at 3:05 p.m. on April 28, 1994, and delivered to the LSI facility at 3:26 p.m. the same day. The courier's log shows that the sample was received from Nolasco, who signed the log, and delivered to an LSI employee, Kim Duffourc, who also signed the log.
According to the chain of custody form, Duffourc, formerly the accessioning supervisor, received the sample from the courier, accessioned it, and placed it in the lock box. Her signature stamp was placed on the form. Dr. Gary H. Wimbish, LSI's laboratory director and an expert in forensic toxicology, also certified the chain of custody form. During his testimony, Dr. Wimbish identified the bar code assigned to the sample upon collection, No. A2545643A, and the bar code assigned by LSI's accessioning unit upon receipt of the sample, No. 475726.
Patricia Pizzo, the director of toxicology for the laboratory, testified she wrote the standard operating procedure for the laboratory and devised the custody forms. She also signed the LSI report sent to the City. She explained the courier's log notation established that Duffourc received the sample from the courier. She stated Duffourc was trained in receiving and processing the samples. Pizzo further explained the batch chain of custody form details everything that happens to a batch of samples. The form documents who receives the samples from the courier and who accessions them. She explained that, during accessioning, the information on the chain of custody form is verified to match the information on the sample, the sample is assigned a laboratory number and bar code which is placed on the chain of custody form and the sample, the seal on the sample is broken, a blind quality control sample is placed in the batch of samples, the samples are then aliquoted to test tubes with the corresponding laboratory bar code. The aliquoted sample is then given to the screening technician.
Pizzo testified the batch chain of custody form established that Duffourc received the batch of samples from the accessioning area, including Murray's sample, No. 475726, accessioned the samples, broke the seals on the specimens, and inserted the blind quality control sample in the batch. The batch chain of custody form further established that Terry Bruner, an accessioning technician no longer employed at LSI, had bar coded the specimens, including Murray's, aliquoted them by placing a smaller amount in a test tube, returned the remainder of the specimens to the temperature-controlled storage area or lock box, and then delivered the aliquoted samples to the screening technician, Kenneth Johnson. Pizzo testified the accessioning technicians are trained to reject as unacceptable any sample with an irregularity in bar codes or other identifying information or with broken seals.
As to the signature stamps used by Duffourc on the accessioning batch chain of custody, Pizzo explained that the technician is permitted a signature stamp under the guidelines of the laboratory certifying agency. The technicians are provided with a locker and key to store the stamp, which is to be kept on their person when in use pursuant to laboratory policy.
The aliquoted portion of the sample was received from Bruner in the accessioning unit by Johnson, who checked the appropriate bar codes, including Murray's sample, No. 475726, placed the sample into the testing instrument, the calibration of which had been previously verified, and tested the sample. Johnson, who has a medical technology degree, explained that each step in the screening process is charted on the batch chain of custody form. He stated he uses a signature stamp which is kept on his person at all times. He explained that he has a locker for storage of the stamp and that he is the only person with a key to the locker. Because Murray's sample exceeded the top calibration of the instrument, Johnson explained it had to be diluted with certified negative urine and retested, again yielding a positive result. Johnson stated he entered the positive result, 200 ng/ml of THC, on Murray's chain of custody form and returned the form to the accessioning unit. The tested sample is discarded. Johnson explained that his results were reviewed by another technician and a quality control specialist.
*842 In the accessioning unit, another testing sample was aliquoted from Murray's original sample by Carolann Zar, who no longer works for LSI. Zar testified that, when she receives the positive result, she pulls the sample from the storage area, verifying the bar code, name, and social security number of the patient. She then aliquots a sample to be delivered to the confirmatory testing unit or gas chromatography/mass spectrophotometry (GC/MS). Zar explained that she signed the chain of custody form showing that she had removed the sample from the lock box to aliquot it for the GC/MS confirmation and then returned the sample to the freezer for permanent storage. The GC/MS confirmation aliquot control sheet also contains Zar's signature, which she identified, establishing that she delivered the aliquot to Dr. Wimbish, who signed the form in receipt.
The second sample was then tested in the confirmation unit by Monica Thompson and Dr. Wimbish using GC/MS to confirm the screening unit's results. Thompson testified that she performed an extraction on the aliquot, derivatized it, and commenced the GC/MS test. She explained that solvents, received from commercial suppliers, are added to the sample to remove impurities to be chromatographed, dried down, and then reconstituted. She verified that the control sheet for the GC/MS confirmation had the same bar code and social security number found on the chain of custody form. She explained that the GC/MS tested for a specific metabolite.
The results of the GC/MS confirmation test are overseen by the laboratory director, Dr. Wimbish, who recorded the results from the machine. The GC/MS confirmation aliquot control sheet contains the results of the test, with the laboratory bar code and the social security number corresponding to Murray's sample. The results are reviewed and certified by Dr. Wimbish. He then recorded those results, 173 ng/ml, on the chain of custody form and signed that form as certification of the results.
Dr. Wimbish testified at length regarding the various custody and testing forms contained in the packet introduced in evidence. He explained the linking and identification marks on the documents. He further explained LSI's standard operating procedure throughout the screening process from receipt of the sample at LSI to the confirmation test, which he personally supervised. Dr. Wimbish reviewed the qualifications required of the technicians and explained the certification process. He described the security measures in force at LSI's facility and identified the individuals with access to the storage area and various units. He also stated that, pursuant to LSI policy, personnel have personal custody of their signature stamps at all times. Dr. Wimbish stated the samples are retained until the litigation is final. He indicated Murray's sample would still be in LSI's storage area.[2]
At the hearing, conducted over three days, March 9, 1995, June 18, 1996, and November 12, 1996, each individual named above, except Duffourc and Bruner, testified as to his or her participation in the testing process. Duffourc and Bruner were no longer employed by LSI at the time of the hearing and efforts to subpoena them were unsuccessful. In lieu of their testimony, LSI's business records and the procedures under which they were maintained were identified and discussed by Dr. Wimbish, Patricia Pizzo, and Kenneth Johnson.
In deciding the Police Department did not have good or lawful cause to terminate Murray's employment, the Civil Service Commission reasoned:
But the required proof that [Murray's] sample was properly handled at the LSI assessioning station was missing. Documents showed that [Murray's] sample (and fifty-nine others) arrived for the assessioning process at LSI where they were supposed to be opened, aliquoted (portion of the sample poured into individual test tubes) and matching bar code stickers were to be placed on the original urine container, the test tube, and on the chain of custody form. The documents further showed that the assessioning work on *843 [Murray's] sample was performed by Terry Bruner under the supervision of her supervisor Kim Dufourc. But both of these individuals had left LSI and the Appointing Authority was unable to serve a subpoena on them. In colloquy with the Hearing Examiner, the Appointing Authority's counsel acknowledged that he had "to have everybody who handled the sample in that lab here." To accommodate the Appointing Authority's difficulty in locating witnesses, the Hearing Examiner held the case open and scheduled a new hearing date to complete the case. But neither Bruner nor Dufourc appeared at the subsequent hearings.
The Appointing Authority tried with two witnesses to fill the gap. Mr. Kenneth Johnson and Ms. Pizzo testified about the procedures during the assessioning stage. But their general testimony about the assessioning process was the same type of testimony rejected in [Blappert v. Department of Police, 94-1284 (La.App. 4 Cir. 12/15/94), 647 So.2d 1339,] and [Sciortino v. Department of Police, 94-0356 (La.App. 4 Cir. 9/29/94), 643 So.2d 841,] for lack of personal involvement in handling the specimen in question.
Since the assessioning stage is an important step in the chain of custody, the failure to verify the handling of [Murray's] sample with the testimony of either Bruner or Dufourc is fatal to the Appointing Authority's case.
The Police Department argues the Commission has misinterpreted Blappert, Sciortino, and George v. Department of Fire, 93-2421 (La.App. 4 Cir. 5/17/94), 637 So.2d 1097, to require each and every person involved in the chain of custody to testify before the appointing authority may be deemed to have carried its burden of proof as to the integrity of the evidence.
The City Civil Service Commission has the duty to decide independently from the facts presented whether the appointing authority had good or lawful cause for taking the disciplinary action and, if so, whether the punishment is commensurate with the dereliction. Walters v. Department of Police, 454 So.2d 106, 113 (La.1984); Cittadino v. Department of Police, 558 So.2d 1311, 1315 (La.App. 4th Cir.1990). Legal cause exists if the employee's conduct impairs the efficiency of the public service in which the employee is engaged. Cittadino, 558 So.2d at 1315. The appointing authority must prove by a preponderance of the evidence that the act occurred and that the act bears a real and substantial relationship to the efficient operation of the public service. Id.
When reviewing the Commission's findings of fact, the appellate court must apply the clearly wrong or manifestly erroneous standard of review. Bannister v. Department of Streets, 95-0404 (La.1/16/96), p. 8, 666 So.2d 641, 647; Walters, 454 So.2d at 113. When reviewing a Commission conclusion as to the existence or absence of cause for dismissal, the appellate court should not reverse the Commission's order unless it is arbitrary, capricious, or characterized by an abuse of discretion. Bannister, 95-0404, p. 8, 666 So.2d at 647; Walters, 454 So.2d at 113.
In a case such as this, where the only damning evidence against an employee is the result of a drug test, and no corroborating evidence of substance abuse exists, the chain of custody becomes the critical issue and must be proved by the appointing authority with great care. Blappert, 94-1284, p. 5, 647 So.2d at 1343. The Commission's findings must be based on competent evidence; incompetent evidence will not be considered on review. George, 93-2421, p. 13, 637 So.2d at 1106. The party seeking to introduce test results must first lay a proper foundation by connecting the specimen with its source, showing that it was properly labeled and preserved, properly transported for analysis, properly taken by an authorized person, and properly tested. Id. Gaps in the chain of custody usually affect the weight of the evidence, not its admissibility, and an unbroken chain of custody is not essential for the admissibility of the evidence, so long as the foundation establishes that it is more probable than not, a preponderance, the specimen tested was that originally taken. Ruddock v. Jefferson Parish Fire Civil Service *844 Bd., 96-831, p. 5, 688 So.2d 112, 115 (La.App. 5 Cir. 1/28/97).
In George, this Court found the Fire Department had met its burden of proof with regard to the chain of custody of the sample. There, the fireman was on temporary leave to run an errand when he was stopped by police officers for driving erratically. The officers suspected he was on drugs and summoned his supervisors. The supervisors had George tested for drugs; the test showed a positive result for cocaine.
George alleged a break in the chain of custody due to the lack of testimony and evidence of who transported the test sample to the laboratory and who handled it there.[3] The witnesses in that case included the director of toxicology, the supervisor of the confirmatory laboratory, the screen supervisor, the accessioning supervisor, the specimen collector, and the courier. Citing Brasseaux v. Louisiana State Racing Commission, 577 So.2d 324, 327 (La.App. 4th Cir.), writ denied, 580 So.2d 670 (La.1991), the court observed that "the chain of custody rule does not require that every person associated with the procedure be identifiedonly that safeguards be instituted to insure the integrity of the evidence." George, 93-2421, pp. 14-15, 637 So.2d at 1107. Acknowledging the appointing authority's burden of proof as a preponderance of the evidence, the court reiterated, "Although the facts must be clearly established, they need not be established beyond a reasonable doubt as in a criminal case." Id., p. 15, 637 So.2d at 1107. The court concluded the witnesses in the chain of custody had testified to "the crucial events in the chain of custodycollection, sealing, delivery to, and receipt by the chemist, testing performed, and analytical methods used." Id. The court further reasoned that George had failed to introduce any evidence showing the specimen had been tampered with, lost, or not the one tested. The court found the fire department had established the integrity of the chain of custody by a preponderance of the evidence.
In the instant case, neither the accessioning supervisor, who received the sample at LSI, nor the accessioning technician, who initially aliquoted the sample, were available to testify. It thus may be argued there is no live testimony that the sample delivered by the courier, the sample received at the laboratory, and the sample aliquoted are the same. On the other hand, the records of the laboratory, namely the chain of custody document, do evidence that the sample tested by Johnson was the same sample collected from Murray at MMU by Nolasco.
Nolasco testified that she sealed and labeled Murray's sample with the bar code at MMU and that this specimen was given to the courier. The courier, Alvarez, testified that he delivered the specimen to LSI and that Duffourc signed his log in receipt of the specimen. Pizzo testified that Duffourc was the accessioning supervisor at the time and that Duffourc's signature was on the courier's log as having received the sample from the courier. Pizzo also testified that Duffourc's signature stamp on the batch chain of custody form indicated Duffourc had followed the accessioning protocol and had labeled Murray's sample and chain of custody form, already identified by the bar code assigned by MMU and Murray's personal information, with an LSI laboratory bar code. An additional tracking number was Murray's social security number as transcribed by Nolasco. Pizzo also testified as to the actions of Bruner, as evidenced by her signatures on the batch chain of custody form and LSI's standard operating procedure. In addition, Johnson, in the screening unit, testified that he had received the aliquoted sample from Bruner before testing it. Lastly, Dr. Wimbish certified the chain of custody form and the results thereon. This form, which tracked the sample from MMU, was stamped with Duffourc's signature, indicating she received the sample from the courier, accessioned it, and placed it in locked storage. Dr. Wimbish also testified as to the accessioning process and pointed out the laboratory bar code on the chain of custody form affixed there by Duffourc. On the whole, *845 this evidence establishes by a preponderance of the evidence the integrity of the chain of custody.
In George, the Fire Department did not introduce the testimony of the two people who actually aliquoted the samples. Instead, Pizzo, as director of toxicology, was permitted to testify regarding the aliquot chain of custody for both the initial screening and the confirmatory testing, because she was responsible for quality control review and her signature was found on both laboratory documents. Here, although the accessioning supervisor did not testify, Dr. Wimbish's signature on the chain of custody form certifies Duffourc's receipt of the sample and her performance of the accessioning. Accordingly, his testimony was competent regarding the receipt and accessioning of the sample.
Two other cases may be distinguished. In Blappert, as in this case, the police officer had been an exemplary employee and underwent the drug screen test as part of his promotion to Police Officer IV. There, however, only Pizzo, the director of toxicology at LSI, testified as to the normal customs and practices of the laboratory regarding the handling of urine samples and the testing procedures. There was no testimony regarding the collection and labeling of the sample at MMU, because the collector was no longer an employee and because no other official from MMU testified regarding the collection procedures. The sample was one of twenty-seven samples picked up at MMU and the Police Department offered no evidence to rebut Blappert's testimony that his specimen was placed on a shelf crowded with other samples.
The Blappert court noted the chain of custody was the critical issue in the case, because there was no corroborating evidence of substance abuse. The court found clearly wrong the Commission's ruling that the test results were accurate. The court noted there was no evidence to prove the urine sample tested was actually that of Blappert. The court concluded the failure to produce a representative from MMU was fatal to the Department's case, observing that the employee's denial of drug use, his excellent performance, and recent negative test raised a strong possibility that the sample had been contaminated or that there was a break in the chain of custody. The court further reasoned the sole witness, Pizzo, had no personal knowledge of the specifics of the chain of custody in this case and could only testify to LSI's general operating procedures. The court opined that the chain of custody was not proven with great care.
In the instant case, every available person involved in the chain of custody testified. The laboratory documents coupled with the testimony of Wimbish and Pizzo on the standard operating procedures of the laboratory were sufficient to establish the sample picked up by the courier from MMU was the same sample delivered to the laboratory, received by the laboratory, and aliquoted for the initial testing. To hold otherwise, mandates that all persons associated in any way whatsoever with the chain of custody testify and that, if one of those persons is not available, the appointing authority cannot meet its burden of proof. Clearly, Blappert does not so hold. Indeed, the Blappert court noted that a qualified representative of MMU could have testified in place of the unavailable collector.
In Sciortino, the court was called on to decide whether the employee was denied due process when he was prevented from having an independent test performed on the urine sample and was denied the right to cross-examine the lab technician who performed the tests and reported them to be positive. There, the seventeen-year veteran gave a urine sample during a random drug test. The test was positive; the employee was dismissed.
The sample was collected at MMU and sent to LSI via courier. At LSI, a technician checked the signature and matching social security number and assigned a laboratory accession number to the sample. Pizzo, the director of toxicology and vice-president of technical affairs at LSI, testified regarding the tests performed on the sample. In her capacity as certifying officer, she reviewed the print-out of the test results brought to her by the technician who had performed the tests. That individual did not testify.
In reversing the Commission's ruling, the court first noted the sample had not been *846 preserved to enable the employee to have it independently tested. The court then opined that Pizzo had not personally received, handled, or tested the sample in question and, therefore, she was not qualified to testify as to the test results. The court concluded there was no evidence to establish that it was Sciortino's urine which was tested.
In the instant case, the nurse who collected the sample, the courier who delivered it to LSI, the screening technician who tested the sample initially, the accessioning technician who aliquoted it a second time, the GC/MS technician who performed the confirmatory test all testified, and the toxicology expert who recorded and certified the results of the confirmatory test, all testified. Although the accessioning supervisor who received the sample at LSI from the courier and assigned it an accession number and the technician who first aliquoted the sample for testing were unavailable to testify, the laboratory's tracking documents and the testimony of the laboratory director and the director of toxicology were sufficient to establish by a preponderance of the evidence that the sample received and tested at LSI was the sample taken from Murray at MMU.
We believe the Commission erroneously extrapolated our decisions in George, Blappert, and Sciortino to require the appointing authority to produce every person in the chain of custody before the authority may be deemed to have carried its burden of proving, by a preponderance of the evidence, the integrity of the chain of custody. Accordingly, based on the evidence introduced at the hearings, we conclude the Commission clearly erred in finding that the appointing authority failed to prove it was more probable than not that the specimen tested by LSI was the same specimen taken from Murray at MMU. Because the decision of the Commission reinstating Murray to his employment was based on an incorrect interpretation of applicable law, the Commission's decision is reversed.
REVERSED.
NOTES
[1] Murray's social security number on the chain of custody form was later found by the City to be off by one digit. On the form, Nolasco had written the number as XXX-XX-XXXX. At the hearing, Wanda Simon, an employee in the City Civil Service office, testified that she had verified that the correct social security number was XXX-XX-XXXX and that she had sent a letter to the laboratory asking it to correct its records. She used Murray's driver's license number and records from MMU to determine that the social security number on the laboratory report was a misprint. Nolasco brought to the hearing a document from MMU showing the personal information provided to her by Murray. Although she read the handwritten number on that document as XXX-XX-XXXX, the document reveals that the number provided by Murray is XXX-XX-XXXX. In sum, Murray provided Nolasco with the correct number; Nolasco put the wrong number on the form; the laboratory used the wrong number throughout the screening process; and the City notified the laboratory of the incorrect number after it had received the laboratory's report. Thus, it appears Nolasco's error was unintentional and innocuous at most.
[2] Though in brief he asserts otherwise, counsel for Murray declined at the hearing an invitation to have the urine sample tested by another laboratory.
[3] George also contended the appointing authority's failure to offer live testimony relating to the chain of custody and the testing of the sample prohibited him from cross-examining the positive test results and violated his right to due process.