1KIRBY, Judge.
Plaintiff, a former tenured teacher in the Orleans Parish school system, filed this action against the Orleans Parish School Board (“School Board”) alleging violations of the Louisiana Tenure Law, La. R.S. 17:461 et seq. According to his petition, plaintiff began his employment with the School Board as a full time teacher in 1989. Plaintiff enjoyed tenure status under R.S. 17:461 et seq. He alleges that on April 14, 1997, he was suspended without pay from active service in the New Orleans school system, based upon charges of immorality and willful neglect of duty. The petition states that the charges of immorality and willful neglect of duty were based upon the results of a drug test administered to plaintiff on or about January 31, 1997.
According to plaintiff, he did not have any drugs in his system when tested; therefore, the test results relied upon by the Orleans Parish school system were flawed. The January 31, 1997 drug test was part of a random drug-testing program in which plaintiff was required to participate after testing positive for cocaine metabolites on May 28,1996.
On April 14, 1997, the School Board received a charge of willful neglect of duty and immorality against plaintiff from Dr. Morris Holmes, Jr., Superintendent | Pof Schools for the Parish of Orleans. This charge referred to plaintiffs past drug use and the positive drug tests of May 28,1996 and January 31, 1997. The School Board held a tenure hearing, after which the plaintiff was found guilty of willful neglect of duty and immorality and ordered terminated from his employment effective December 3,1997.
Plaintiff alleged in his petition that the actions of the School Board in dismissing him from employment violated his statutory and other rights because the determination to terminate his employment was made without competent evidence. Specifically, plaintiff alleged that the School Board allowed the New Orleans Public School System to introduce test results over the plaintiffs objections without requiring the New Orleans Public school system to first lay a proper foundation by connecting the urine specimens offered as evidence with its source, showing that it was properly labeled and preserved, properly transported for analysis, properly taken by an authorized person and properly tested.
According to plaintiffs petition, the School Board erred in allowing the test results into evidence based solely on the testimony of Michael Feldman, the technical manager of substance abuse testing for the laboratory that contracted with the Orleans Parish school system. Plaintiff alleged that Feldman had not personally received, handled, or tested the sample in question and, therefore, was not qualified to testify as to the test results. Based on these allegations, plaintiff claimed that there was no competent evidence to establish that plaintiffs urine was tested.
Plaintiff also alleged that the School Board’s suspension of plaintiff without pay prior to his tenure hearing and the School Board’s final determination violates La. *66 R.S. 17:462. Plaintiff asked in his petition that the School Board be compelled |3to place plaintiff back into active service as a tenured teacher, with full back pay, benefits, and other emoluments of employment, plus court costs, together with legal interest from date of judicial demand.
The School Board presented the testimony of five witnesses at the tenure hearing: 1) Karen Griffin, a phlebotomist employed by SmithKline Beecham Clinical Laboratories in New Orleans; 2) Julia Roy, another phlebotomist employed by SmithKline Beecham Clinical Laboratories in New Orleans; 3) Michael S. Feldman, Ph.D., .the technical manager of substance abuse testing for SmithKline Beecham Clinical Laboratories in Atlanta, Georgia; 4) Warren McKenna, Jr., M.D., a medical officer with the Orleans Parish school system; and 5) Migel Elie, another medical officer with the Orleans Parish school system. Plaintiff also called three witnesses: 1) Lennie Roes, an employee of the New Orleans Substance Abuse Clinic; 2) Father Jerome Ledoux, pastor of the church where plaintiff is a parishioner; and 3) plaintiff. Griffin, Roy and Feldman were the only witnesses that testified regarding the chain of custody of the urine specimen collected from plaintiff for drug screening purposes.
Karen Griffin explained that a phlebo-tomist is someone who draws blood from patients and collects urine specimens for drug screening. She testified as to the procedures used in the collection of urine specimens. She described the precautions taken by those collecting urine specimens to ensure that the sample handed to them is the specimen actually produced by the person undergoing the drug screen.
Griffin identified her signature on a SmithKline Beecham chain of custody form for a urine drug screen, which showed that she collected a urine sample from plaintiff on May 28, 1996. At that point in her testimony, the attorney for plaintiff | ¿stipulated to plaintiffs drug usage in May 1996, but specifically denied that this was a violation of School Board policy because plaintiff did not use or have possession of drugs on School Board property.
Griffin stated that once a urine sample is taken, it is sealed in a bag and given to a courier to be transported to the Smith-Kline Beecham laboratory in Atlanta, Georgia. She said she did not specifically remember taking the specimen from plaintiff or giving the specimen to the courier, but she identified her signature on the form showing that she collected the specimen. She also stated that she did not recall taking a specimen from plaintiff on any day other than May 28,1996.
Julia Roy, another phlebotomist with SmithKline Beecham in New Orleans, also described the procedures used in collecting urine samples for drug screen testing. She said that the person from whom urine is being collected has only a few minutes to go into a bathroom and produce a urine specimen, which is then handed directly to the collector as the person giving the specimen exits the bathroom. She identified her signature on a SmithKline Beecham chain of custody form, which showed that she collected a urine sample from plaintiff on January 31, 1997. Roy did not specifically remember plaintiff or taking this drug screen, but she testified that the form showed that she collected a urine sample from plaintiff on that date. She stated that she seals the specimens in a bag and puts them in a refrigerator but she does not personally hand the specimens to the courier.
Michael S. Feldman, Ph.D. testified that he is the manager of the drug-testing laboratory at the SmithKline Beecham laboratory in Atlanta, Georgia, and has held that *67 position since May 1993. Feldman described the procedures used at SmithKIine Beecham to protect the integrity of the urine samples in the laboratory. He stated that when a specimen arrives at the laboratory, it is checked to make sure 1 ¡¡that there is no evidence of tampering with the bag or bottle, that the identification of the specimen has been properly verified and that the chain of custody that documents the transfer of the specimen from the collector to the laboratory is complete. He said that the laboratory is in a facility with full-time security. Feldman described the process used to analyze urine specimens to determine what drugs, if any, are present in the urine.
Feldman then explained the chain of custody procedures used at the SmithKIine Beecham laboratory in Atlanta. He said that every step in the handling of a specimen or portion of a specimen, which is referred to as an aliquot, must be documented, i.e., who received the specimen, to whom the specimen was released, etc. He said that every action requires a signature.
Feldman identified the forms used in documenting the chain of custody of the urine specimen allegedly obtained from plaintiff in May 1996. He referred to one form that was allegedly completed at the collection site, which showed that the specimen was packed and sealed in a bag and transferred by courier to the Atlanta laboratory. He also said the form indicated that an employee of the Atlanta laboratory named Avery Jones received the specimen, verified the labeling, and inspected the package. According to this form, Avery Jones released the specimen to Marketta Long, who performed the pre-log process that generates the analyte accession label. That label is then placed on the bottle and is used to track the bottle as it moves through the laboratory system. Marketta Long handed the specimen over to Cynthia Morgan, who provided the full-log function. He described Morgan’s duties as typing all of the information into the computer and verifying that the information in the computer matches the information on the documents.
| ^Cynthia Morgan then handed over the specimen to Carl Moore, the supervisor of specimen processing, who actually opened the bottle and poured a portion of the specimen into a test tube and placed it in the analytical load. According to Feld-man, Moore then closed the bottle and placed it in the temporary storage position, which is a large cart with a lock on it. The specimen is then put away until needed for some future purpose. Feldman stated that when a specimen arrives at the laboratory, the specimen is assigned several identification numbers and is referred to by these numbers only from that point forward. The numbers are placed on the label generated during the pre-log function.
According to Feldman, after Carl Moore opened the bottle and poured the aliquot, he passed it to technician Jose Kyles, who performed the immunoassay-screening test. Michelle Dupaty then removed the specimen from the instrument and discarded the aliquot. Peter Shaw, the certifying scientist, reviewed the data after the technician reviewed the data, as part of a quality assurance review.
Feldman explained that an analyte aliquot is a portion of the urine specimen that is placed into a test tube. He stated that the laboratory never tests directly on the specimen bottle for fear of contaminating the specimen itself. He said the original bottle never leaves the specimen processing area. It only moves in and out of temporary storage for the purposes of opening the bottle and pouring an aliquot, and then it is returned to the temporary storage area. Feldman said the aliquot *68 test tube bears a bar code number that ties it back to the number on the original specimen bottle. He testified that the aliquot bearing numbers assigned to the plaintiffs alleged specimen tested positive for cocaine metabolites.
Feldman also testified as to a chain of custody form listing the people involved with the extraction, the purification of the cocaine metabolites, the |7loading of the aliquot into a certain area after cocaine was found, and the people who took the data, interpreted it, and put it into the computer. This form indicated that Alma Cruz poured the aliquot for the cocaine confirmation, took the bottle out of the temporary storage for the purpose of building the cocaine confirmation load and then put the bottle back into temporary storage.
After Feldman’s direct testimony on the procedures used and test results obtained from the May 1996 specimen, the parties stipulated that Feldman’s testimony as to the testing of the January 1997 specimen would be that the same procedures were used and the aliquot tested positive for cocaine metabolites. They also stipulated that the only difference between the first test and the second test was that there was a request for a retest in the second test.
On cross-examination, Feldman testified that he did not inspect the specimens for tampering when they arrived at the Atlanta laboratory. He did not personally verify the identification on the specimens, and he was not the person who confirmed that the documents regarding chain of custody from the collector to the laboratory were complete. Feldman acknowledged that other employees of SmithKline Beecham performed these tasks. When asked about the specifics of the SmithKline Beecham courier system that transported the plaintiffs alleged specimens from New Orleans to Atlanta, Feldman admitted he had no personal knowledge as to how many people are involved in that chain, but that it could be as many as four or more. Feldman testified that his chain of custody documents only reflect that the specimens were transferred by courier from the collector to the laboratory.
Feldman stated that he was not present when the specimens received in Atlanta were released from the pre-log process. He also did not participate in the | ^transfer of specimens from the pre-log process to the full-log function. He did not personally verify that the information in the computer matched the information on the documents and he did not process the specimens in question. He did not break the seal of the bottle and pour a portion of the urine into the test tube and he did not close the bottle and return the bottle to the temporary storage position. He did not pass the specimens to the technician nor did he remove the aliquots to perform the immunoassay-screening test. Feldman did not review the data or determine its acceptability, and he did not conduct the quality assurance review on these particular tests.
Feldman testified that the aliquots in question were each tested in a batch with thirty-nine other aliquots. However, he stressed that the test of each aliquot is separate. Regarding the confirmation tests, Feldman stated that he did not participate in the extraction of the aliquots or the purification of the cocaine metabolites. He did not take the data, interpret it, or enter it into the computer. Feldman admitted that he did not personally participate in any phase of the testing procedure of plaintiffs alleged specimen.
Feldman was then questioned regarding the retesting of the January 1997 specimen. He testified as to the chain of custody for removing the specimen from tern- *69 porary storage in order to perform the retest. The retest indicated a positive result for cocaine metabolites. He said that the same mechanisms were in place to preserve the integrity of the sample as were present in the original testing. Feldman said the records pertaining to the retest did not indicate any evidence of tampering or laboratory accidents. He said that other than the scheduling of the retest, he did not personally participate in any phase of the retesting procedure. He stated that his participation during the testing consisted of managing the laboratory |flto ensure that the people who worked in the laboratory were doing their jobs properly. However, he did not personally supervise the testing of any particular sample.
At the conclusion of the hearing, the School Board found plaintiff guilty of willful neglect of duty and immorality and terminated his employment effective December 3, 1997. Plaintiff filed a petition for judicial review of the School Board’s action in Orleans Parish Civil District Court pursuant to La. R.S. 17:443. The trial court reversed the decision of the School Board and rendered judgment holding that plaintiffs right to due process was violated and remanding this case to the School Board for rehearing with both parties allowed the opportunity to introduce evidence after establishing a proper foundation and to cross-examine that evidence (citing Bourque v. Louisiana State Racing Commission, 611 So.2d 742 (La.App. 4 Cir.1992.)) The School Board now appeals the trial court judgment.
On appeal, the School Board argues that the trial court erred in reversing the School Board’s decision to terminate plaintiffs employment. Specifically, the School Board argues that: 1) the trial court erred as a matter of law in holding that cases regarding the Louisiana Administrative Procedures Act (“LAPA”) apply to the present case, 2) the evidence relied upon by the School Board was supported by an ample evidentiary basis for finding that the chain of custody and actual collection and testing procedures were properly done, and 3) purported hearsay evidence regarding random drug test results is held to a stricter standard of review in LAPA-governed administrative proceedings only when it accounts for the only basis for disciplinary action.
In George v. Department of Fire, 93-2421 (La.App. 4 Cir. 5/17/94), 637 So.2d 1097, this Court discussed the minimum procedures due prior to the | indischarge of a tenured public employee as set forth in Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). A pre-termination hearing should be held to determine whether reasonable grounds existed to believe that the charges against the employee are true in order to support the proposed action. George, supra, at p. 9, 637 So.2d at 1104.
La. R.S. 17:462 lists willful neglect of duty and immorality as two of the grounds for removing a tenured teacher employed by the Orleans Parish School Board. The standard for reviewing a school board’s decision after a tenure hearing has two parts: 1) determination of whether the hearing was conducted in accordance with the formalities of the tenure law, and 2) determination of whether the decision is based on substantial evidence. Coleman v. Orleans Parish School Board, 93-0916, 94-0737, p. 3 (La.App. 4 Cir. 2/5/97), 688 So.2d 1312, 1314. Substantial evidence is evidence of such quality and weight that reasonable and fair-minded men in exercise of impartial judgment might reach different conclusions. Id. at p. 4, 688 So.2d at 1315. A school board’s decision should not be reversed unless *70 there is a clear showing of an abuse of discretion. Id.
In the instant case, whether the hearing was conducted in accordance with the formalities of the tenure law is not at issue. In this appeal, we are focused on the issues of whether the School Board’s decision to terminate plaintiffs employment was based on substantial evidence, and whether the trial court’s decision to reverse the decision of the School Board was manifestly erroneous.
The School Board’s argument that the trial court improperly relied on cases regarding the LAPA is based on the trial court’s citation of Bourque v. Louisiana State Racing Commission, 611 So.2d 742 (La.App. 4 Cir.1992), in its judgment. This Court, in Bourque, based its decision on the requirements of the LAPA. The InSchool Board contends that it is a political subdivision and, therefore, is not bound by the LAPA. In support of this contention, the School Board cites George v. Department of Fire, 93-2421 (La.App. 4 Cir. 5/17/94), 637 So.2d 1097.
In George v. Department of Fire, supra, this Court refused to apply the requirements of the LAPA to a Civil Service Commission case because according to a 1979 amendment to the LAPA, that Act applies only to state agencies. See La. R.S. 49:951(2). The amendment also specifically exempted political subdivisions from application of LAPA rules. “Political subdivision” has been defined as “a parish, municipality, and any other unit of local government, including a school board and a special district, authorized by law to perform governmental functions.” La. Const, art. VI § 44(2). (emphasis ours). Therefore, the School Board is correct in its assertion that it is not bound by requirements of the LAPA.
Based on this Court’s language in George v. Department of Fire, supra, on the specific issue of agencies to whom the requirements of the LAPA apply, we conclude that the trial court’s citation in its judgment of Bourque v. Louisiana State Racing Commission, supra, was improper and the judgment will be amended to delete reference to that citation. However, as amended, we affirm the trial court’s judgment because, for reasons that follow, we concur in the trial court’s finding that plaintiffs right to due process was violated.
The School Board’s second assignment of error is that the trial court erred in holding that the School Board violated plaintiffs right to due process by not establishing a proper foundation for the evidence offered against him.
In support of this argument, the School Board cites the case of LoCicero v. Jefferson Parish Department of Fleet Management, 98-521 (La.App. 5 Cir. 12/16/98), 722 So.2d 1205. In LoCicero, an employee of Jefferson Parish was terminated from his employment because of a positive drug test. The defendant called three witnesses to establish the chain of custody of the specimen: 1) the Jefferson Parish medical review officer, who reviewed the chain of custody documents and found no irregularities; 2) the technical manager of the SmithKline Beecham Substance Abuse Testing Laboratory, who explained how the specimen was tested and identified the names of all people involved in the chain of custody; and 3) the health care worker who collected the specimen from plaintiff and completed the preliminary paperwork. This third witness testified that she remembered plaintiff, but the Fifth Circuit stated that even if she had not remembered plaintiff, there was no explanation as to how the plaintiffs initials ended up on the unbroken seals of the specimen bottles and bag when the laboratory received *71 them if there had been a mix-up of the samples. The Fifth Circuit found that there was an ample evidentiary basis for finding that the chain of custody of the sample and the actual collection and testing procedure were properly done. Id. at pp. 5-6, 722 So.2d at 1208.
The School Board argues that the evidence presented in the instant case is nearly identical to that found to be sufficient in the LoCicero case. It points out that Michael Feldman, the technical manager for the SmithKline Beecham Substance Abuse Testing Laboratory, testified in both cases. The School Board also notes that the fact that the phlebotomists in this case who collected the urine specimens from plaintiff could not recall the plaintiff is irrelevant. This argument is based on the Fifth Circuit’s conclusion in LoCicero, that there was no other explanation for how plaintiffs initials came to appear on the unbroken seals of the bottle and bag containing the specimen in question.
|, ¡Although we acknowledge the similarities between the evidence presented in the instant case and the evidence presented in LoCicero v. Jefferson Parish Department of Fleet Management, supra, we are not bound by this decision of the Fifth Circuit and we decline to apply it in this matter. Our review of the jurisprudence from our Circuit shows that the evidence presented by the School Board on the issue of chain of custody of the urine specimens was not sufficient to satisfy due process concerns. We first note that the School Board has not shown that it has any defined evidentiary rules regarding the standard to be used for chain of custody of urine specimens obtained for drug screening of employees. Our research has not revealed any cases in our Circuit specifically dealing with the issue of what evidentiary rules apply to a school board in establishing the chain of custody of urine specimens used in drug screenings. Therefore, we will turn to cases involving Civil Service Commission employees for instruction, as the requirements of the LAPA apply to neither Civil Service employees nor Orleans Parish School Board employees, according to George v. Department of Fire, 93-2421 (La.App. 4 Cir. 5/17/94), 637 So.2d 1097.
This Court has stated that a party seeking to introduce test results must first lay a proper foundation by connecting the specimen with its source, showing that it was properly labeled and preserved, properly transported for analysis, properly taken by an authorized person, and properly tested. George v. Department of Fire, supra, citing Segura v. Louisiana State Racing Commission, 577 So.2d 1031, 1033 (La.App. 4 Cir.1991). The chain of custody rule is intended to preserve the integrity of the evidence and to protect it from tampering and loss. Id.
In George v. Department of Fire, supra, several witnesses in the chain of custody testified, including the director of toxicology, the supervisor of the h confirmatory laboratory, the screen supervisor, the accessioning supervisor, all from the testing laboratory, the specimen collector, and the courier. In Murray v. Department of Police, 97-2650 (La.App. 4 Cir. 5/27/98), 713 So.2d 838, chain of custody witnesses who testified included the nurse who collected the specimen, the courier, the screening technician, the accessioning supervisor, the technician who performed the confirmatory test, and the toxicology expert who recorded and certified the results of the confirmatory test. In both George and Murray, this Court found that the chain of custody of each of the specimens was proven by sufficient evidence. On the other hand, in Sciortino v. Department of Police, 94-0356 (La.App. 4 Cir. 9/29/94), 643 So.2d *72 841, the file from the screening laboratory was introduced on the basis of the testimony of the laboratory’s director of toxicology and Vice President of Technical Affairs. This file was the only evidence that established that plaintiffs urine specimen testified positive for marijuana. This Court found that the evidence presented was insufficient to establish chain of custody, noting that the director of toxicology did not personally receive, handle, or test the specimen in question and the person who actually tested the specimen was not produced as a witness. Id.
In the instant case, the only witnesses testifying regarding the chain of custody of the urine specimens were the phlebotom-ists who collected specimens from plaintiff in May 1996 and January 1997, and the technical manager of SmithKline Beecham, who admittedly did not personally participate in any phase of the testing of the urine specimens in question. The Smith-Kline Beecham technical manager’s testimony was the basis for introduction of the SmithKline Beecham documents detailing each step in the chain of custody, but there was no testimony from anyone who actually performed any of the functions in the chain of 11ñcustody once the specimens left the New Orleans laboratory. After reviewing the evidence presented regarding chain of custody, we conclude that the evidence presented was not substantial enough to prove that the urine specimens collected from plaintiff were the ones actually tested and that the specimens collected from plaintiff tested positive for cocaine metabolites. Without substantial evidence of these facts, the termination of a tenured teacher cannot be supported.
Finally, the School Board argues that even if the testimony presented was not sufficient to establish a foundation for the drug test results, the School Board did not abuse its discretion in its decision to terminate plaintiffs employment because the decision was not based solely upon the positive results of the two drug tests. The School Board argues that plaintiffs prior history of drug use and excessive absenteeism were also factors contributing to the decision to terminate employment. It argues that the trial court erred in holding the School Board to the higher standard of evidentiary proof enunciated in Bourque v. Louisiana State Racing Commission, 611 So.2d 742 (La.App. 4 Cir.1992), because in Bourque, unlike the instant case, the positive drug tests were the sole basis for the disciplinary action.
We have already stated that the trial court improperly relied on the standards enunciated in Bourque v. Louisiana State Racing Commission, supra. However, regardless of the burden of proof used by the trial court, we find that the evidence on chain of custody of the urine specimens was insufficient by the substantial evidence standard set forth in the case of Coleman v. Orleans Parish School Board, 93-0916, 94-0737 (La.App. 4 Cir. 2/5/97), 688 So.2d 1312.
Furthermore, we note that the April 14, 1997 letter from the Superintendent of Schools to the School Board, charging plaintiff with immorality and willful |irineglect of duty, mentions plaintiffs past use of drugs but is silent as to absenteeism. Although the School Board argues that there are other bases besides the positive drug tests for the charges of immorality and willful neglect of duty against plaintiff, the record of the hearing in this matter shows that the School Board based its decision to terminate plaintiffs employment on their finding that “the evidence sustains the allegations appearing in paragraphs 1, 2, 3, [and] 4.” Paragraphs 1 and 4 of the April 14, 1997 letter allege that plaintiff tested positive for cocaine metabolites on May 28, 1996 and January 31, *73 1997. Because the School Board referred to these allegations collectively in its decision to terminate plaintiffs employment, this decision cannot be upheld unless there was substantial evidence as to all four of these allegations. Due to our finding that the School Board did not present substantial evidence on the allegations of plaintiffs positive drug tests, we cannot say that the trial court was manifestly erroneous in reversing the School Board’s decision and remanding this matter for further proceedings.
Accordingly, for the reasons stated above, we amend the trial court’s judgment to delete the reference to the case of Bourque v. Louisiana State Racing Commission, 611 So.2d 742 (La.App. 4 Cir.1992). As amended, we affirm the judgment of the trial court.
AMENDED, AND AS AMENDED, AFFIRMED.