809 So.2d 932 (2002)
Roy ARRIOLA
v.
ORLEANS PARISH SCHOOL BOARD.
No. 2001-C-1878.
Supreme Court of Louisiana.
February 26, 2002.
*933 Christopher Chocheles, Debra F. Cottrell, Sher, Garner, Cahill, Richter, Klein, McAlister & Hilbert, New Orleans, Counsel for Applicant.
Jay A. Ginsberg, Charles M. Samuel, III, New Orleans, Counsel for Respondent.
Karen D. Murphy, Baton Rouge, Counsel for Louisiana School Board Association (Amicus Curiae).
KNOLL, Justice.
This writ concerns the sufficiency of chain of custody for a urine sample procured for random drug testing from a public school teacher. Specifically, plaintiff claims his due process rights were violated, because the school superintendent did not "present the live testimony of persons who actually received and tested Mr. Arriola's urine sample." The plaintiff was terminated by defendant based on evidence of a positive drug test for cocaine. The district court found plaintiffs due process rights were violated and remanded for rehearing for the taking of further evidence. Before such rehearing, the Court of Appeal affirmed the trial court's findings that plaintiffs due process rights were violated. We reverse the lower courts, finding that the chain of custody evidence for the drug test was based on a foundation that satisfied due process, and that the school board's termination decision was based on substantial evidence of drug abuse. Accordingly, we reinstate the decision of the Orleans Parish School Board.

*934 Factual and Procedural Background
Roy Arriola ("Arriola") was a tenured public high school teacher in New Orleans. In April 1996, Arriola attended a conference called by his principal, concerning problems with his attendance. During the conference, Arriola admitted that his attendance problems resulted from a dependency on cocaine. He provided a urine sample on May 28, 1996, which tested positive for cocaine metabolites. Pursuant to the policy of the Orleans Parish School Board ("School Board"), Arriola was placed on an outpatient treatment and monitoring program plus required to submit to a six month period of random drug testing beginning August 22, 1996. Arriola returned to his teaching responsibilities in a probationary status at the beginning of the 1996-97 school year. During the period of his outpatient treatment, which ended December 12, 1996, Arriola's urine never tested positive.[1] However, as part of random testing during his probationary period, on Jan. 31, 1997, Arriola provided a urine sample which the testing laboratory, SmithKline Beecham Clinical Laboratories ("SmithKline"), reported as positive for cocaine metabolites.
The record shows that SmithKline's actual testing laboratory was in Atlanta, while the physical location where Arriola's urine was collected, SmithKline's Patient Servicing Center, was located in New Orleans. The record further shows that SmithKline was a National Institute on Drug Abuse ("NIDA") certified laboratory, which certification allowed it to perform drug testing of federal employees.
After SmithKline reported that Arriola's urine tested positive, the Superintendent of Schools for the Parish of Orleans ("Superintendent") referred to the School Board a charge of willful neglect of duty and immorality against Arriola, seeking to terminate his employment. At the termination hearing, the Superintendent presented the testimony of three witnesses regarding the chain of custody of the urine samples.
The first witness, Karen Griffin, a phlebotomist[2] employed by SmithKline, described the procedures for collecting urine samples at a SmithKline Patient Servicing Facility to be sent to the laboratory for testing. While examining SmithKline's chain of custody documentation, Ms. Griffin identified her signature on a form showing that she had collected the sample of May 28, 1996. She further identified her notations on the form that the sample was given to SmithKline's courier network for transit to its testing laboratory.
The second witness, Julia Roy, was also a SmithKline phlebotomist. While examining the chain of custody documentation, she likewise identified her signature as indicating that she collected a urine sample from Arriola on January 31, 1997. Like Ms. Griffin, Ms. Roy identified her signature on the chain of custody form and her instructions sending the sample to the testing laboratory.
Both Ms. Roy and Ms. Griffin testified that after a sample is collected, but before being sent to the testing laboratory, the donor completes the requisition form and initials the seal that is placed over the lid of the bottle containing the sample. At *935 the hearing, the Superintendent introduced a photocopy of the seal which Arriola had initialed. The Superintendent also introduced records indicating that upon receipt at the laboratory, the bottle's seal and a second seal, enclosing the plastic bag placed over the bottle which Arriola also initialed, were both unbroken seals upon arrival.
The third witness, Michael Feldman, Ph. D., was the manager of the testing laboratory. Dr. Feldman, whose doctorate is in the area of drug metabolism and biopharmacy, testified that he supervised and was ultimately responsible for the laboratory's specimen processing and testing. He described the laboratory's testing procedures and reliability safeguards at length. Additionally, while reviewing the chain of custody documentation, Dr. Feldman testified to the chain of custody procedures employed at the laboratory from receipt of a sample to testing and retesting[3] of the sample.
After all three witnesses had reviewed the chain of custody documentation, the Superintendent offered the documentation into evidence. Arriola objected, essentially arguing that the phlebotomists, who collected the samples at a SmithKline Patient Service Facility, could not serve as a foundation for the documents because they were not part of the chain of custody for the reason that they did not work at the actual testing laboratory. Arriola argued that the testimony of the lab director could likewise not serve as a foundation for admitting the documentation because he did not perform the actual testing and he neither received nor handled the urine sample in question. Over Arriola's objection, the School Board received the documentation in evidence. Other than this objection to the chain of custody of the tested sample, Arriola did not allege any particular flaws in the testing procedures to suggest that the SmithKline test results were inaccurate.
At the hearing's conclusion, the School Board found that due to his drug abuse, Arriola evidenced immorality and willful neglect of duty. The School Board therefore terminated Arriola's employment.
Pursuant to La. R.S. 17:462 B,[4] Arriola filed a petition of review in the Civil District Court for the Parish of Orleans. In his petition, Arriola alleged that the School Board allowed the documentation into evidence "solely" on the testimony of the lab director, Dr. Feldman. Later, Arriola argued that Dr. Feldman's testimony was "largely hearsay because he did not personally receive, handle, or test the samples in question." Arriola argued that he was therefore denied the opportunity to cross-examine the only evidence introduced against him, specifically the positive test results, and that the minimal standards of due process were not met.
After a hearing, the district court held: "[F]inding that Arriola's right to due process was violated, this case is remanded to the School Board for rehearing with both parties allowed the opportunity to introduce evidence after establishing a proper foundation and to cross-examine that evidence. See Bourque vs. Louisiana State *936 Racing Commission 611 So.2d 742 (La. App. 4 Cir.1992)" [sic].
The Court of Appeal affirmed, finding "that the evidence on chain of custody of the urine specimens was insufficient by the substantial evidence standard set forth in the case of Coleman v. Orleans Parish School Board, 93-0916, 94-0737 (La.App. 4 Cir. 2/5/97), 688 So.2d 1312." Arriola v. Orleans Parish Sch. Bd., XXXX-XXXX, p. 15 (La.App. 4 Cir. 5/23/01), 789 So.2d 64, 72. We granted the School Board's writ to study the correctness vel non of the lower courts. Arriola v. Orleans Parish Sch. Bd., 01-1878 (La.10/12/01), 799 So.2d 488.
Before this court, Arriola reiterated his due process challenge to the chain of custody documentation. The School Board argued that due process was satisfied under the standards of the federal Constitution announced in the administrative procedures holding of Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) and the public employee case of Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

DISCUSSION

I. The Chain of Custody and Due Process
We initially note that Arriola has made no allegation of a particularized defect in the chain of custody. Likewise, he does not argue that the testing procedures are inaccurate, or that any of the laboratory procedures interfered with proper testing of a urine sample, or that his urine sample was contaminated. Instead, in a blanket challenge based upon due process, he makes essentially two arguments: first, that due process was not satisfied because there was an insufficient foundation to admit the documentation evidencing the chain of custody; and second, that due process could only be satisfied in this case by presenting live testimony of the individuals who both received and tested the urine sample. We address each argument in turn.
Throughout the course of his appeal, Arriola has contended that the only method for the Superintendent to introduce the chain of custody evidence was through the testimony of Dr. Feldman. Arriola argued that the admission of the chain of custody documentation was improper, because the documentation lacked a foundation insofar as Dr. Feldman was not himself a link in that chain. However, contrary to Arriola's assertion that Dr. Feldman's testimony was the "sole" basis for admitting the evidence, our examination of the hearing transcript reveals that although the Superintendent offered the documentation into evidence after Dr. Feldman's review, the earlier testimony of the phlebotomists, who were the first links in the chain of custody,[5] satisfied the requirements for a proper foundation. See, e.g., State v. Merrill, 94-0716, (La.App. 4 Cir. 1/31/95), 650 So.2d 793, writ denied 95-0530, (La.6/23/1995) 656 So.2d 1012.
In Merrill, a criminal defendant argued that the State failed to lay the proper foundation for the introduction of a rock of crack cocaine because, he argued, the State failed to prove that the rock analyzed by the State Police laboratory was indeed the actual object he allegedly gave to the arresting parish police officer. The court found that a proper foundation existed, based upon the testimony of the parish officer who was the first link in the chain *937 and the officer's initials on a sealed envelope sent to the State Police Crime Laboratory. The court noted: "The law does not require that the evidence as to custody eliminate all possibility that the object has been altered. For admission, it suffices that it is more probable than not that the object is the one connected to the case." Id. at p. 9, 650 So.2d at 799 (Emphasis added).
In the instant case, we observed that each phlebotomist testified as to her training and experience with the collection of urine samples and identified her signature as the first link in the chain of custody documentation. Additionally, each testified from her review of the documentation that Arriola initialed the seal on the lid of the bottle containing the sample and that Arriola initialed the seal on the bag that contained the bottle.
We observed that the chain of custody documentation also consists of several forms, the first of which has donor identification information which Arriola completed when he presented his sample for testing. The subsequent forms were generated at the SmithKline laboratory and purport to be continuations of the chain, and were generated as needed to reflect the subsequent handling involved in the testing for indicators of various drugs.
We note that Arriola makes much over the fact that the phlebotomists who collected his urine did so at SmithKline's Patient Servicing Center in New Orleans and that no one from SmithKline's Atlanta laboratory who received the sample testified. However, because Arriola gives us no basis for doing so, we decline to draw a distinction between the SmithKline Patient Service Facility and the SmithKline testing laboratory. We therefore find that similar to the officer in Merrill, the phlebotomists who collected Arriola's sample were the first links in the chain of custody and that their testimony provided the minimum required by due process to admit the chain of custody documentation.
Furthermore, even though the documentation was introduced after the testimony of the third witness, Dr. Feldman, and not immediately after the phlebotomist whose testimony established the foundation, tenure hearings are not held to the same formalistic requirements of trials for the introduction of evidence. See Roberts v. Rapides Parish Sch. Bd., 617 So.2d 187 (La.App. 3 Cir.1993)(holding that in tenure hearings, "strict rules of authentication... do not apply" and even though the superintendent conceded that the copy of the movie "Child's Play" offered as evidence was not the same copy that the teacher showed in class, the School Board properly admitted the videotape copy when other witnesses identified the copy as being the same movie). Accordingly, we find no error in the method of introducing the documentation.
It is worthy to note that even if Arriola had pointed to a specific gap within the chain of custody between the Smith-Kline Patient Servicing Center and the actual testing laboratory, our review of the jurisprudence indicates that courts have treated gaps within the chain of custody as a question involving the weight of the evidence, rather than its admissibility. See, e.g., State v. Sam, 412 So.2d 1082, 1086 (La.1982); United States v. Lott, 854 F.2d 244, 250 (7th Cir.1988); State v. Dunbar, XXXX-XXXX, (La.App. 4 Cir. 8/8/01), 798 So.2d 178, 181. Thus, we conclude that a proper foundation for the chain of custody documentation was established.[6]
*938 In addition to his first argument, lack of foundation, Arriola further argues that the School Board's findings were based solely on the documentary evidence without live testimony detailing the actual receipt and testing of the samples in the laboratory. Without this live testimony, Arriola contends that he had no opportunity to cross-examine the evidence. In short, while the Superintendent presented the testimony of someone within the chain of custody and testimony as to the testing procedures from the laboratory's director, Arriola's second argument is that due process can only be satisfied by the live testimony of individual(s) who both received and tested the urine sample. Stated differently, this second argument is really a proposal for testimony from both: 1) additional persons in the chain of custody at the actual testing laboratory; and 2) persons actually performing testing.[7]
In order to address this argument, because Arriola draws no distinction between the due process guarantees of the Fourteenth Amendment to the federal Constitution and the guarantees of Article I, § 2 of the Louisiana Constitution of 1974 to show that the Louisiana Constitution would require anything greater than the federal, for present purposes, we treat the guarantees of each as coterminous. Accordingly, we draw upon the jurisprudence for each, and accept the School Board's assertion that Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) and Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) provide the primary principles to resolve the due process issue.
In Loudermill, the Court stated that the balancing test announced in Eldridge, 424 U.S. at 335, 96 S.Ct. 893, applies when evaluating the process afforded a tenured public employee prior to discharge. See Loudermill, 470 U.S. at 542-43, 105 S.Ct. 1487. Accordingly, when evaluating the propriety of the employment termination proceeding, we must balance the following three factors from Elderidge:
[F]irst, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, *939 and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.
Eldridge, 424 U.S. at 335, 96 S.Ct. 893.
Turning to the first factor, the nature of the interest, both Arriola and the School Board are in agreement. Arriola's interest in continued public employment is a property interest under Loudermill, 470 U.S. at 543, 105 S.Ct. 1487.
As to the second factor, the risk of erroneous deprivation and value of proposed safeguards, Arriola makes no factual contention to buttress his claim that the chain of custody procedures employed in his case presented a risk of an incorrect result. Even his implication in brief, that because the phlebotomists confirmed that the SmithKline Patient Servicing Center had no security to protect against tampering with the samples in storage that his tests may be flawed, challenges only the weight of the evidence. This challenge does not constitute an affirmative showing for requiring the live testimony of others in the chain of custody or of those who actually perform the tests. In short, in addition to failing to show a risk of erroneous deprivation under the procedures used, Arriola fails to show a probative benefit for requiring the testimony of persons in the chain of custody at the laboratory and the testimony of persons actually performing the tests.
On the other hand, squarely addressing the second factor in Eldridge, the School Board points out that the chain of custody documentation is reliable, and consequently, that the testimony of the director was sufficient, because SmithKline was a National Institute on Drug Abuse ("NIDA") certified laboratory. In support of this contention, the School Board cites to the rigors required for SmithKline's federal certification which obviates the need for certain State inspections[8] and particularly for this case, its continued use of "approved agency custody form[s] from the time of collection to receipt by the laboratory and that upon receipt by the laboratory an appropriate chain of custody form account[s] for the sample or sample aliquots within the laboratory." See Mandatory Guidelines for Federal Workplace Drug Testing Programs, § 1.2, 53 Fed. Reg. 11,970, 11,979 (1988). Furthermore, to support its argument that not requiring testimony of actual testing personnel presents a minimal risk of erroneous deprivation, the School Board contends that NIDA laboratories are recognized as the gold standard among drug testing laboratories. See David W. Lockard, Protecting Medical Laboratories From Tort Liability for Drug Testing, 17 J.Legal Med. 427, 431 (1996)(stating that "[t]he highest standards are found only in the medical laboratories certified by the National Institute on Drug Abuse ..." and indicating that in 1996, only 90 out of approximately 1,200 drug testing facilities in the U.S. satisfied NIDA standards).
As to the third Eldridge factor, governmental interest and burden of the proposed procedure, Arriola argues that the burden of providing additional chain of custody and testing witnesses cannot be so great because R.S. 17:462 empowers the School Board to issue subpoenas, compel the attendance of witnesses, and require the production of documentary evidence. For its part, the School Board urges that it has a "vested interest in ensuring that its *940 employees who come in direct and daily contact with children are people of good moral character and influence." Citing Williams v. Concordia Parish Sch. Bd., 95-980, pp. 3-4 (La.App. 3 Cir. 1/31/96), 670 So.2d 351, 354. Furthermore, the School Board argues that procuring additional chain of custody testimony would be a huge fiscal burden, and amicus Louisiana School Board Association adds that in light of the expense, school systems would effectively be prevented from terminating employees for drug abuse.
In light of these arguments, when we consider that on the one hand, Arriola proposes that additional testimony of chain of custody and testing personnel is a prerequisite to admitting the test results, and on the other the school board details the burden and expense of such testimony, without Arriola making a showing of the value of his proposal for additional live testimony, the balance tilts against his position.
Indeed, while Arriola has a property interest at stake, his proposal for additional chain of custody testimony to satisfy the foundation requirement appears to exceed the standard for admissibility in criminal trials. See, e.g., United States v. Lott, 854 F.2d 244, 250 (7th Cir.1988); State v. Simon, 544 So.2d 610 (La.App. 3 Cir.1989)(holding that in criminal case, a continuous chain of custody need not be proven as long as the evidence as a whole establishes that it is more probable than not that the object introduced is the same as that seized). Furthermore, Arriola's argument that a constitutionally sufficient opportunity for cross-examination requires the testimony of testing personnel fails when one recalls that "due process requires greater protections when liberty interests are implicated as opposed to property interests." See Brown v. Brienen, 553 F.Supp. 561 (C.D.Ill.1982), citing Arnett v. Kennedy, 416 U.S. 134, 178-79 n. 6, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)(White, J., concurring and dissenting).
In sum, we find that due process was accorded to Arriola's hearing. The testimony of the laboratory director presented sufficient opportunity for cross-examination of the test results. Likewise, the testimony of the phlebotomists allowed Arriola to challenge the foundation of the chain of custody documentation. The record reveals that the due process was more than an abstraction as Arriola availed himself of the opportunity to cross-examine the phlebotomists and the laboratory director.

II. Review of the Evidence
Certainly, affording Arriola procedural due process was not the only prerequisite to terminating his employment. The Superintendent had to show that there was substantial evidence of a violation of its policy against drug abuse. Again, we note that Arriola's blanket challenge was one of procedural due process; he has not alleged a particular flaw with the chain of custody, the testing procedures, or any other evidence to indicate the test results were inaccurate. Even so, we review the sufficiency of the evidence under our jurisdiction to review both law and fact. La. Const. Art. V § 5(C). In our evidentiary review, we apply the substantial evidence standard recognized by the Court of Appeal in Coleman: "`Substantial evidence' has been defined as `evidence of such quality and weight that reasonable and fair-minded men in exercise of impartial judgment might reach different conclusions.'" Coleman, p. 4, 688 So.2d at 1315 (citing Wiley v. Richland Parish Sch. Bd., 476 So.2d 439, 443 (La.App. 2 Cir.1985)).
Having settled that the documentation relating to the testing of his urine sample was properly admitted, we note that Dr. Feldman's testimony was relevant to the *941 ultimate issue of drug abuse. Moreover, Arriola concedes in brief that Dr. Feldman was "qualified to interpret the documents...." Dr. Feldman testified that the sample identified as Arriola's urine tested positive for cocaine metabolites in an initial screening, that a more sophisticated test was then performed which quantified the level of metabolites, and that based on the initial screening and the subsequent quantification, NIDA guidelines allowed the laboratory to report to the Superintendent that the sample tested positive.
As recounted above, the phlebotomists testified as to the collection of Arriola's urine and also testified as to the chain of custody of the sample, and we found this testimony and the chain of custody documentation properly admitted. From this testimony and documentation, we find substantial evidence to support the conclusion that Arriola engaged in drug abuse during the periods in question, based on the presence of cocaine metabolites in the samples identified as Arriola's.
In its review, the Court of Appeal stated that "[a]fter reviewing the evidence presented regarding chain of custody, we conclude that the evidence presented was not substantial enough to prove that the urine specimens collected from plaintiff were the ones actually tested and that the specimens collected from plaintiff tested positive for cocaine metabolites." Arriola, 789 So.2d at 72. (emphasis added; other emphasis in original omitted). However, to say that the evidence was not substantial "enough" is to nevertheless acknowledge that the evidence was substantial. Having reached that threshold of "substantial," the evidence was sufficient to uphold the termination of employment. In essence, the Court of Appeal would have imposed a less discretionary standard of review that it recognized in Coleman. See Coleman, 688 So.2d at 1315: "Great deference should be given to a board's factual findings and credibility determinations.... Reasons for dismissal are largely in the sound discretion of the school board.... The school board's judgment should not be reversed in the absence of a clear showing of abuse of discretion." (Internal citations to Gaulden v. Lincoln Parish Sch. Bd., 554 So.2d, 152, 157 (La.App. 2 Cir.1989) omitted).
Furthermore, we see no need for the School Board to confine its consideration of the charge of drug abuse to any one particular piece or type of evidence. See, e.g., Chapital v. Orleans Parish School Bd., XXXX-XXXX (La.App. 4 Cir. 2/7/01), 780 So.2d 1110 (On review, the court considered the totality of the evidence: "The testimony and exhibits showed a pattern of improper physical contact with students."). Accordingly, in our examination of the record, we find that the chain of custody evidence, the testing procedures, the test results, and other evidence in support of the charge against Arriola, including his past admissions of drug abuse, offered a sufficient basis for a reasonable and fairminded factfinder, in the exercise of impartial judgment, to reach the conclusion that Arriola violated the drug abuse policy. Thus, the decision of the School Board to terminate Arriola's employment was proper.
For the foregoing reasons, the judgments of the District Court and the Court of Appeal are hereby reversed and vacated, and the decision of the Orleans Parish School Board to terminate Roy Arriola's employment is reinstated.
REVERSED AND RENDERED.
CALOGERO, C.J. concurs and assigns reasons.
VICTORY, J., concurs with reasons assigned by CALOGERO, C.J., additionally.
*942 CALOGERO, C.J. concurring and assigning reasons.
I agree with the majority that the evidence presented at the school board proceeding was sufficient to show a violation of school board policy and that defendant's termination was warranted.
I only concur, however, on the issue of the lab report's admissibility. The majority goes to great lengths discussing chain of custody, foundation and consequential due process principles because the parties have postured the case in that manner. In my view, such a discussion is unnecessary. Pursuant to La.Code Civ. Proc. art. 2164, this court may render any judgment which is just, legal, and proper upon the record on appeal. In my view, the issue as to the lab report's admissibility can be simply resolved by Code of Evidence Art. 803(6)[1]. The lab test results are records of regularly conducted business activity of Smith-Kline Beecham Clinical Laboratories and hence, admissible as an exception to the hearsay rule.
Furthermore, this court has previously held that La.Code Evid. 803(6) does not require a showing of chain of custody. This court has stated that "[w]hile (803(6)) requires that a custodian or qualified witness testify that the requirements of the business records exception have been met, there is no requirement that the `qualified witness' must have personally participated in or observed the creation of the document." Judd v. State, Dept. of Transp. and Development, 95-1052 (La.11/27/95), 663 So.2d 690, 696. Chain of custody goes to the weight of the evidence, not the admissibility of the document. See Id. Here, the Superintendent of the School Board introduced the lab report through Michael Feldman, the manager of the Smith Kline testing lab. Dr. Feldman, according to his position at Smith Kline, is qualified to testify as to the authenticity of the lab report and the document was properly introduced.
I note that there is authority for the proposition that the Louisiana Code of Evidence does not apply to School Board proceedings under the Tenure Act.[2] That rule, however, is meant to allow a more relaxed approach to evidence offerings in school board proceedings. Certainly, however, as in this case, if the evidence presented meets the more rigid requirements of the Code of Evidence and would be *943 admissible under those rules, the evidence is admissible under the more relaxed standards of the School Board proceedings.
Hence, I concur on the issue of admissibility of the lab reports, finding that Louisiana Code of Evidence art. 803(6) properly allows the introduction of such documentation.
NOTES
[1] Arriola's substance abuse counselor testified, however, that a screening of Arriola's urine before he began treatment was positive. Without Arriola's objection, the counselor further testified that when the counselor asked him to explain why his urine indicated drug abuse, Arriola stated that he was just trying to test the drug testing system to see if it actually worked.
[2] Ms. Griffin testified that a phlebotomist collects materials for medical testing, such as blood, and in this case, urine.
[3] At Arriola's request, the urine sample of January 31, 1997 was retested. Again, it tested positive for cocaine metabolites.
[4] La. R.S. 17:462 B provides in pertinent part:

If a permanent teacher is found guilty by the school board, after due and legal hearing as provided herein, on charges of wilful neglect of duty, or incompetency, or immorality... and ordered removed from office or disciplined by the said board, the teacher may, not more than one year from the date of said finding, petition a court of competent jurisdiction for a full hearing to review the action of the school board....
[5] Although Arriola admitted drug abuse in April 1996, he challenges the documentation of the positive result of his May 1996 urine sample inasmuch as that test result triggered his probation which led to the January 1997 testing and the ultimate termination of his employment. Because Arriola makes the identical due process challenge for both tests, we likewise need not address them separately.
[6] While the School Board urges that we find that due process was satisfied because the documentation alone could have been introduced without testimony under the business records exception to the hearsay evidence exclusion, we decline to so hold. Despite some authority for that argument (see e.g., Ruddock v. Jefferson Parish Fire Civil Svc. Bd., 96-831 (La.App. 5 Cir. 1/28/97), 688 So.2d 112; Mollette v. Kentucky Personnel Bd., 997 S.W.2d 492 (Ky.App.7/30/99), this case reached this court on a due process challenge and we address it according to the due process arguments submitted. Given that a due process inquiry must focus on the particular nature of the proceeding at issue, further comment upon standards not at issue in the instant case would be improvident. Instead, we confine our review to the question as Arriola has presented it: whether minimal due process standards were met).
[7] Arriola bases this argument on the Court of Appeal's holding in Bourque v. Louisiana State Racing Comm'n, 611 So.2d 742 (La.App. 4 Cir.1992) in which the court held that a drug test result collected by a State Chemical Inspector and shipped to a testing laboratory was inadmissible without "any live testimony detailing the actual receipt and testing of the sample at the laboratory." Id. at 744.

Bourque is inapplicable to the instant case because Bourque addressed due process safeguards in the context of administrative hearings conducted pursuant to the Louisiana Administrative Procedure Act ("LAPA"), La. R.S. 49:950 et seq. See Bourque, 611 So.2d at 743. As the Court of Appeal recognized in the instant case, the LAPA applies to state agencies, not to political subdivisions and their components, such as local school boards. See Arriola, XXXX-XXXX, p. 11 (La. App. 4 Cir. 5/23/01), 789 So.2d at 70 (citing George v. Department of Fire, 93-2421 (La. App. 4 Cir. 5/17/94), 637 So.2d 1097).
In the absence of a particularized attack upon the chain of custody, we do not need to reach the issues of which persons within the chain of custody must testify or whether anyone at all need testify. For the instant blanket challenge, we need only evaluate the procedures as they were conducted in this case and evaluate Arriola's argument via his proposed standard.
[8] See La. R.S. 49:1008 (Supp.2001)("A.(1) Screening laboratories ... shall be inspected..."). But see La. R.S. 49:1001(20)("`Screening laboratories' means any ... facility ... which is not NIDA certified...").
[1] La.Code Evid. art. 803(6) reads as follows:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(6) Records of regularly conducted business activity. A memorandum, report, record, or data compilation, in any form, including but not limited to that which is stored by the use of an optical disk imaging system, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and to keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. This exception is inapplicable unless the recorded information was furnished to the business either by a person who was routinely acting for the business in reporting the information or in circumstances under which the statement would not be excluded by the hearsay rule. The term "business" as used in this Paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. Public records and reports which are specifically excluded from the public records exception by.
[2] See Coleman v. Orleans Parish School Board, 93-0916, 94-0737, p. 13 (La. App. 4 Cir. 2/5/97).